**UNITED STATES STEEL CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 65 Civ. 3043.**

United States District Court, S. D. New York.

July 14, 1970.

White & Case, New York City, for plaintiff; A. Chauncey Newlin, Haliburton Fales, 2d, Thomas B. Leary, Rayner M. Hamilton, Edmund W. Pavenstedt, Donald T. MacNaughton, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., S. D. New York, for defendant; Alan B. Morrison, Richard M. Hall, Asst. U. S. Attys., David A. Wilson, Atty., Dept. of Justice, Washington, D. C., of counsel.

## OPINION, FINDINGS OF FACT AND
## CONCLUSIONS OF LAW.

LEVET, District Judge.

This opinion involves issues in an action by United States Steel Corporation ("U. S. Steel") against the United States, pursuant to 28 U.S.C. § 1346(a) (1), for refund of certain 1950 income and excess profits tax payments, together with interest. By agreement of the parties, the present issues were tried by the court without jury. (2–4)[1]

## PRIOR PROCEEDINGS IN THIS LITIGATION

*A. The Complaint*

In a complaint dated September 30, 1965 and filed October 11, 1965, U. S. Steel[2] brought suit under 28 U.S.C. § 1346(a) (1) to recover portions of federal income tax paid for the year 1950. Plaintiff claimed that certain 1950 federal income and excess profits tax payments were erroneously and illegally assessed and collected.

In general, U. S. Steel maintained in the complaint:

1. That it was entitled to additional depletion deductions for the year 1950.

2. That certain alleged abnormalities occurring during 1947, 1948 and 1949 should have been considered by defendant in the computation of the "average base period net income" figure for the relevant base period years 1947–1949, which figure was used to determine the extent to which U. S. Steel was subject to income and excess profits taxes for the year 1950. The abnormalities alleged were (a) low quality of coking coal and iron ore, resulting in loss of production; (b) abnormal cost-price relationships, resulting in the depression of plaintiff's business and earnings; (c) numerous and protracted strikes, resulting in the interruption and diminution of plaintiff's normal production, output and operation; and (d) other abnormalities referred to at the time plaintiff's 1950 consolidated federal income and excess profits tax return was filed.

3. That, if it be determined that plaintiff is entitled to no relief or only certain partial relief under 2 above, plaintiff should be entitled to press an alternative claim for disallowance of deductions for certain "strike expenses."

1. Unless otherwise identified, numbers in parenthesis refer to pages in the trial transcript.

2. For a listing of U. S. Steel's major subsidiaries during the years 1933 to 1950, see Finding of Fact #9, infra.

## B. Rulings on Motions for Summary Judgment

As to plaintiff's claim for additional depletion deductions, both parties moved for summary judgment. On May 19, 1967, this court denied plaintiff's motion and granted defendant's motion, holding in substance that, for the purpose of calculating the deduction for percentage depletion under 26 U.S.C. §§ 23 (m) and 114(b) (4) of the Internal Revenue Code of 1939, plaintiff, as lessee, could not include payments of Minnesota ad valorem and royalty taxes in its gross income from mining. 270 F.Supp. 253 (S.D.N.Y.1967).

As to plaintiff's claim that "low quality of coking coal and iron ore, resulting in loss of production" was a qualifying abnormality for excess profits tax purposes within the meaning of 26 U.S.C. Excess Profits Taxes § 442 (1939 Code), the defendant moved for summary judgment. The motion was granted on July 1, 1969 and plaintiff's subsequent motion for reargument was denied on October 2, 1969. In substance, this court held as a matter of law that war-induced shortages of men and materials and delays by suppliers and subcontractors during the period of 1941 to 1948 may not constitute the basis for relief under § 442, because effects directly attributable to United States government policies during World War II, including post-war competitive pressures engendered by wartime conditions, are not qualifying abnormalities within the meaning of the statute. 305 F.Supp. 497 (S.D.N.Y.1969), 305 F.Supp. 516 (S.D. N.Y.1969).

As to plaintiff's claim that "abnormal cost-price relationships, resulting in the depression of Plaintiff's business and earnings" constituted a qualifying abnormality within the meaning of § 442, the defendant moved for summary judgment. The motion was granted on July 1, 1969 and plaintiff's subsequent motion for reargument was denied on October 2, 1969. This court held in substance that the factors submitted by plaintiff were not shown to consist of more than the valid exercise of governmental regulatory authority or competitive pressures which businessmen must reasonably expect in the course of their operations. 305 F.Supp. 508 (S.D.N.Y. 1969), 305 F.Supp. 516 (S.D.N.Y.1969).

## C. Issues Remaining for Trial

The present proceedings arise primarily from U. S. Steel's allegations in the complaint that "numerous and protracted strikes, resulting in the interruption and diminution of Plaintiff's normal production, output and operation; and other abnormalities" qualify as "unusual" occurrences under § 442. U. S. Steel now contends that the allegedly "unusual" events—a 1948 explosion, two 1948 strikes by the United Mine Workers and a 1949 strike by the United Steel Workers—significantly affected plaintiff's taxable income within the meaning of § 442(a) during the years 1948 and 1949, which years were designated as part of the base period pursuant to the Excess Profits Tax Act of 1950, 26 U.S.C. Excess Profits Taxes § 430 et seq. As a result of the alleged effects of these events on its taxable income in 1948 and 1949, plaintiff suggests, the defendant should have computed U. S. Steel's "average base period net income" for the relevant base period years 1947–1949 in accordance with relief provisions contained in § 442, so as to decrease the amount of tax owed for 1950 by the taxpayer.

If it develops that plaintiff is not entitled to any application of § 442 for 1948 and 1949 or that it is entitled to § 442 application for only one of the years (i. e., 1948 or 1949), plaintiff presents an alternative claim under 26 U.S.C. Excess Profits Taxes § 433(b) (9) for disallowance of deductions for certain "strike expenses" incurred in the year 1949. If U. S. Steel should then be eligible for application of § 442 and § 433(b) (9) for 1949, plaintiff may opt for application of whichever section would afford greater relief to the taxpayer. (Stipulation, May 26, 1970)

## PLAINTIFF'S POST-TRIAL CONTENTIONS

The plaintiff's claims after trial may be set forth generally as follows:

1. The two 1948 United Mine Workers' strikes which shut down U. S. Steel's coal-producing facilities and resulted in interruptions in production at plaintiff's steel-making facilities were "unusual" occurrences within the meaning of § 442;

2. The 1948 explosion at plaintiff's South Works in Chicago, Illinois was an "unusual" occurrence within the meaning of § 442;

3. U. S. Steel's 1948 income before federal income taxes was reduced (as a result of "unusual" occurrences within the meaning of § 442) to a legally significant extent below what such income otherwise would have been; consequently plaintiff is entitled to application of § 442 for the year 1948.

4. The 1949 United Steel Workers' strike which shut down plaintiff's steel-making facilities was an "unusual" occurrence within the meaning of § 442;

5. U. S. Steel's 1949 income before federal income taxes was reduced (as a result of the "unusual" occurrence) to a legally significant extent below what such income otherwise would have been; consequently, plaintiff is entitled to application of § 442 for the year 1949.

6. If plaintiff is not entitled to any § 442 application for 1948 and 1949 or if plaintiff is entitled to § 442 application for only one of the years (i. e., 1948 or 1949), plaintiff presses an alternative claim under § 433(b) (9) for disallowance of deductions for certain 1949 "strike expenses;" if plaintiff qualifies for application of both § 442 and § 433 (b) (9) for 1949, it seeks relief under whichever section is more favorable.

## DEFENDANT'S POST-TRIAL CONTENTIONS

The defendant's positions in response to plaintiff's contentions may be set forth generally as follows:

1. The 1948 United Mine Workers' strikes were not "unusual" events under § 442;

2. The 1948 explosion at U. S. Steel's South Works was concededly an "unusual" event; but

3. Plaintiff's 1948 income before federal income taxes was not reduced to a legally significant extent as a result of the 1948 explosion, the only "unusual" occurrence which affected U. S. Steel's 1948 income.

Consequently, plaintiff is not entitled to application of § 442 for the year 1948.

4. The 1949 United Steel Workers' strike was concededly an "unusual" event; but

5. U. S. Steel's 1949 income before federal income taxes was not reduced to a legally significant extent as a result of the 1949 strike.

Consequently, plaintiff is not entitled to application of § 442 for the year 1949.

6. Plaintiff is not entitled to any relief for its alternative claim under § 433(b) (9).

## ISSUES

The following issues are before the court for determination:

1. Were the two 1948 strikes against plaintiff by the United Mine Workers qualifying abnormalities within the meaning of 26 U.S.C. Excess Profits Taxes § 442(a) (1939 Code)?

2. If the two 1948 strikes were qualifying abnormalities, has U. S. Steel proved by a fair preponderance of the credible evidence that its 1948 income before federal income taxes was reduced to a legally significant extent (below what such income otherwise would have been) as a result of 1948 qualifying abnormalities, i. e., the 1948 explosion at plaintiff's South Works in Chicago, Illinois, which explosion is conceded by defendant to have been a qualifying abnormality, and the two 1948 strikes (if it has been determined that the strikes were qualifying abnormalities)?

3. If the two 1948 strikes were not qualifying abnormalities, has plaintiff proved by a fair preponderance of the credible evidence that its 1948 income before federal income taxes was reduced to a legally significant extent as a result of the 1948 explosion (which would then be the only qualifying abnormality for 1948)?

If U. S. Steel has sustained its burden of proof as to the issues mentioned above, plaintiff is entitled to have its net income for the base period year 1948 computed in accordance with § 442 for excess profits tax purposes.

4. Has plaintiff proved by a fair preponderance of the credible evidence that its 1949 income before federal income taxes was reduced to a legally significant extent as a result of the 1949 strike against plaintiff' by the United Steel Workers (which strike is conceded by defendant to have been a qualifying abnormality)?

If U. S. Steel has sustained its burden of proof as to the fourth issue, plaintiff is entitled to have its net income for the base period year 1949 computed in accordance with § 442 for excess profits tax purposes.

5. If plaintiff is not entitled to any § 442 application for 1948 and 1949 or if plaintiff is entitled to § 442 application for only one of the years (i. e., 1948 or 1949), has plaintiff proved by a fair preponderance of the credible evidence that it is entitled to relief pursuant to its alternative claim under 26 U.S.C. Excess Profits Taxes § 433(b) (9) for disallowance of deductions for 1949 "strike expenses"? If so, is plaintiff entitled to greater relief for 1949 under § 433(b) (9) or § 442?

## I. PLAINTIFF'S CLAIMS UNDER SECTION 442

### RELEVANT STATUTE

26 U.S.C. Excess Profits Taxes § 442 (a) reads in pertinent part:

"§ 442. *Average base period net income—abnormalities during base period*

"(a) *In general.* If a taxpayer \* \* establishes that, for any taxable year within, or beginning or ending within, its base period:

"(1) normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during such taxable year, of *events unusual and peculiar in the experience of such taxpayer* \* \* \* [emphasis added]

the taxpayer's average base period net income [shall be] determined under this section \* \* \*."

## THE APPLICABLE STANDARD FOR DETERMINING WHETHER THE 1948 STRIKES WERE QUALIFYING ABNORMALITIES WITHIN THE MEANING OF SECTION 442

The Excess Profits Tax Act of 1950, 26 U.S.C. Excess Profits Taxes § 430 et seq., which is designed to tax at high rates unusually high profits earned during the Korean War, imposes a tax on profits in excess of an amount deemed to represent the taxpayer's normal profits. Jarecki v. G. D. Searle & Co., 367 U.S. 303, 304, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961).

The object of relief provisions under both the Korean War Act and its predecessor, the World War II Excess Profits Tax Act of 1940, 26 U.S.C. Excess Profits Taxes § 710 et seq., was to ensure that the finally derived "average base period net income" should reflect what the taxpayer would have earned in the excess profits tax year (i. e., 1950) but for the war which may have fortuitously increased profits.

In furtherance of this objective, actual base period net income which is unrepresentative for a statutorily-defined reason should be replaced by a constructive income. Oxford Paper Company v. Commissioner of Internal Revenue, 302 F.2d 674, 681 (2nd Cir. 1962).

In order to warrant general relief under the statute, the taxpayer must first establish at least one qualifying abnormality for each one of the relevant base

period years for which it seeks application of § 442. If more than one qualifying abnormality has been established for a particular year, the properly established effects of each of the qualifying abnormalities on the taxpayer's income for that year may then be aggregated for purposes of determining whether the taxpayer has made the required showing of "significant and not trivial" diminution in its normal productive process for that year *due to any qualifying abnormalities.* See Reg. 130 (1939 Code), § 40.-442-2(a) (2).

Since the parties agree that the 1948 explosion and the 1949 strike by the United Steel Workers were qualifying abnormalities under § 442, the court need consider only the extent of the quantitative effects of those events on U. S. Steel's income for each of the years involved. With respect to the 1948 strikes by the United Mine Workers, the parties disagree on the initial issue of unusualness.[3] The court must therefore determine whether the 1948 strikes were in the first instance qualifying abnormalities within the meaning of § 442(a) (1).

The regulations advise that an event during a base period year may be "unusual" in the "experience of the taxpayer" if occurrence of the event "is not ordinarily encountered in the taxpayer's business operations." If unusualness is established, the taxpayer must also establish that any "unusual" occurrences in a base period year significantly interrupted "normal production, output, or operation," defined as "the level of production, output, or operation customary for the taxpayer, determined on the basis of the actual experience of the taxpayer up to the time" the "unusual" event occurred. Reg. 130, § 40.442-2(a) (1) (2) (3).[4]

There can be no dispute that a strike is an event within the purview of § 442(a) (1). Reg. 130, § 40.442-2(a) (3) ("* * * events include floods, fires, explosions, strikes, and other exceptional and uncommon circumstances hindering production, output or operation."); Sen. Rep. No. 2679, 81st Cong., 2d Sess., dated December 18, 1950, as quoted in Internal Revenue Cumulative Bulletin 1951–1, 252 ("* * * [the World War II] law provided relief * * * because of a physical interruption to production, such as a fire, strike, or flood, * * *. Your committee's bill provides relief in these same areas.").

In discussing a framework for analysis of the factual record presented at trial, plaintiff argues (1) that strikes by the United Mine Workers (which affect U. S. Steel's coal-producing facilities and may also result in interruption of production at plaintiff's steel-making facilities) and strikes by the United Steel Workers against plaintiff's steel-making facilities should be considered as separate and distinct types of events under § 442; and (2) that a strike or strikes during a taxpayer's base period might be deemed "unusual" under § 442 if the strikes in question had a substantially greater impact on production and shipments than other strikes in the years before the base period.

After a careful study of the statute, regulations, legislative history and prior judicial determinations, I believe plaintiff's first proposition is unsound, and its second generally sound.

3. Although the statute refers to events unusual *and peculiar*, neither side in this case has suggested that the word "peculiar" has any meaning in the statutory context independent of the requirement of unusualness. It appears that most, if not all, courts called upon to interpret § 442(a) (1) or its forerunner in the World War II Act, § 722(b) (1), 26 U.S.C. Excess Profits Taxes § 722(b) (1), have quoted the words of the statute and then proceeded without further discussion of the word "peculiar."

4. In Oxford Paper Company v. Commissioner, supra at 679, the Court of Appeals held that a determination of whether an "unusual" event significantly interrupted "normal" production must take into account increased capacity that would have been used during the base period year or years but for the occurrence of the "unusual" event.

## A. A Strike As An Event

According to the appropriate regulation, " * * * events include * * * strikes, and other exceptional and uncommon *circumstances hindering production, output, or operation.*" (Emphasis added) Reg. 130, § 40.442–2(a) (3). A strike is thus viewed as an occurrence which hinders production, output or operation.

Similarly, the Senate Committee on Finance, referring to a strike as an event, focused on a strike as a potential interruption of production: " * * * [the law provides relief] when * * * the income * * * was substantially abnormal *because of a physical interruption to production*, such as a * * * strike * * *." (Emphasis added) Sen.Rep. No. 2679, 81st Cong., 2d Sess., as quoted in I.R.C.B. 1951–1, 252.

In essence, the type of event contemplated is a *strike which interrupts production*. In evaluating a strike as an event, the court must consider it primarily in the sense of a physical interruption of production brought about by labor-management difficulties. Another court, considering whether a strike during a base period year was an "unusual" event in the taxpayer's experience, referred to the taxpayer's overall "labor history" and "labor picture." See New York Shipbuilding Corporation v. United States, 237 F.Supp. 995, 1001 (D.N.J. 1965), aff'd per curiam, 362 F.2d 550 (3rd Cir. 1966).

U. S. Steel has been engaged principally "in the integrated business of making and selling iron and steel products" since 1901. (Stipulation, June 10, 1970) Plaintiff's production and shipment of iron and steel products might be subject to interruption because of a strike either by the United Mine Workers or the United Steel Workers. It is of course possible that a strike by the United Mine Workers against plaintiff's coal-producing facilities might not affect plaintiff's production of iron and steel products, for coal production is but one step in the ultimate production and shipment of iron and steel products. However, insofar as the record may indicate that a coal strike and resultant unavailability of coke did interrupt iron and steel production at plaintiff's steel-making facilities, it seems inappropriate to segregate the effects of a coal strike on such production in a given year from the effects of a steel strike on such production in the same year.

The court believes that the proper analytical yardstick (for determining whether the two 1948 strikes by the United Mine Workers were "unusual" under § 442) is physical interruption of U. S. Steel's production and shipments of iron and steel products due to strikes against plaintiff's production facilities, whether by the United Mine Workers, the United Steel Workers, or another union representing other employees of U. S. Steel.

## B. Comparing the Effects on Production and Shipments of the 1948 Strikes and Strikes in Other Relevant Years

An event may be declared "unusual" within the meaning of § 442 if its occurrence "is not ordinarily encountered in the taxpayer's business operations." Reg. 130, § 40.442–2(a) (3).

U. S. Steel, while acknowledging that strikes or work stoppages against its production facilities by the United Mine Workers and the United Steel Workers had occurred in the years before 1948, contends that the two 1948 strikes by the United Mine Workers were "unusual" events because of their impact upon the production of iron and steel. (Plaintiff's First Reply Memorandum Re 1948 Coal Strikes, April 9, 1970, p. 4)

There is authority for the general principle that an event need not be unique for it to be considered "unusual" under § 442.

In Oxford Paper Co., 33 T.C. 943 (1960), rev'd on other grounds, 302 F.2d 674 (2nd Cir. 1962), the Tax Court decided that a drought in the base period years 1947 and 1948 was an "unusual" event under § 442. After weighing such factors as average rainfall in the years

1894–1945 and average monthly river flow in the years 1912–1946, the Tax Court found that the 1947–1948 drought "was of greater intensity and of longer duration than any other that Oxford has experienced during its considerable history," and held that the drought in question was "so severe" as to constitute a qualifying abnormality within the meaning of § 442(a) (1). See 33 T.C. at 953, 959. See also the reference in New York Shipbuilding, supra at 998, to the Tax Court's findings in Oxford Paper ("There had been other droughts, but none so severe.").

Since § 442(a) (1) requires that events during a year or years within the base period be "unusual" in the experience of the taxpayer, it seems appropriate to compare the event or events (proposed as "unusual" occurrences in the base period) with the same type of events in the taxpayer's experience *before the onset of the base period*. See Oxford Paper Company v. Commissioner, supra, 302 F.2d at 678; New York Shipbuilding, supra, 237 F.Supp. at 1001. Therefore, in a determination of whether the 1948 strikes were "unusual" events, the court believes that the occurrence of strikes during the base period years 1946 and 1947 should not be dispositive. Still another reason for excluding consideration of any 1946 strikes on the issue of unusualness is the procedure set forth in §§ 435(d) (2) and 442(b) (2) (A) of the Korean War Act. Although the Act provided a base period consisting of the years 1946–1949 (§ 435 (b)), a taxpayer is entitled under § 435 (d) (2) and § 442(b) (2) (A) to eliminate automatically the least profitable year during the period, irrespective of whether any abnormality allegedly within the scope of § 442(a) had occurred. See Oxford Paper Company v. Commis-

sioner, supra, 302 F.2d at 676. U. S. Steel chose to eliminate the year 1946 (Complaint, dated September 30, 1965, p. 3).

▪ Plaintiff alleges that the 1948 coal strikes reduced its 1948 income by causing certain increased costs as well as lost income from production and shipment of iron and steel products. It is true that certain increased costs may be considered (in addition to income losses in production and shipments) for purposes of a determination whether a qualifying abnormality or qualifying abnormalities interrupted the taxpayer's normal productive process in a relevant base period year to the extent required, i. e., significant and not trivial. However, a qualifying abnormality or qualifying abnormalities must first be established before any increased costs may be considered. It may be noted that plaintiff has not claimed that the 1948 strikes were qualifying abnormalities because of alleged increased costs resulting from the strikes; rather, it maintains that any such costs are relevant only to the determination of whether there was a significant impact on income in 1948 as a result of an occurrence or occurrences already found to be "unusual" within the meaning of § 442(a). (Plaintiff's Third Reply Memorandum Re 1948 Coal Strikes, April 27, 1970, pp. 4–5)

▪ I conclude that determination of whether the two 1948 strikes were "unusual" under § 442 should be based upon a comparison of losses of shipments of iron and steel products in 1948 (as a result of the two 1948 strikes)[5] with losses of shipments of iron and steel products on a yearly basis as a result of strikes against U. S. Steel's production facilities in years before 1946,[5A] the beginning of the statutory base period. It would be

---

5. With reference to strikes, U. S. Steel has limited its 1948 claim of losses in production and shipment of iron and steel products to the two strikes by the United Mine Workers in March–April 1948 and July 1948, although there may have been some other losses from other strikes or work stoppages during 1948. (1280–1281)

5A. U. S. Steel did not claim at trial that its own production and shipments of iron and steel products in the years 1941–1945 and 1948 were interrupted by any strikes against outside organizations such as suppliers.

impossible of course to determine such losses with exactitude. By sifting the record, the court strives to fashion a reasonable approximation from the evidence presented.

## THE NATURE OF PLAINTIFF'S EVIDENCE RELATING TO ESTIMATES OF PRODUCTION LOSSES DUE TO STRIKES

During the course of the trial, which ran approximately twenty-two days, more than two-hundred exhibits submitted by plaintiff and defendant were admitted into evidence. Among these were plaintiff's exhibits 132–143, 128, 124, 55, 56, 94–97, all of which were admitted as business records within the ambit of 28 U.S.C. § 1732(a).

28 U.S.C. § 1732(a) provides in relevant part:

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circum-

stances shall not affect its admissibility. * * * "

In the landmark case of Palmer v. Hoffman, 318 U.S. 109, 114, 63 S.Ct. 477, 480, 87 L.Ed. 645 (1943), Justice Douglas, speaking for a unanimous court, stated that the basic standards for admissibility under § 1732 are "the character of the records and their earmarks of reliability * * * acquired from their source and origin and the nature of their compilation." The trial judge is in the best position to gauge the regularity and trustworthiness of a record proposed as evidence. See Gaussen v. United Fruit Company, 412 F.2d 72, 74 (2nd Cir. 1969).

Exhibits 132–136, 138, 140–143 are said to include each of the available "Form B" reports prepared at production plants of U. S. Steel subsidiaries as an estimate of production losses due to strikes or work stoppages [6] during the years 1941 to 1950. Available contemporaneous lists of the "Form B" reports were submitted for the years 1944 (Ex. 139) and 1945 (Ex. 137).

Exhibit 128 is a summary prepared by U. S. Steel's Cost and Statistics Division of "Work Stoppages—Detail," including estimates of production losses and man-hour losses for the years 1942–1950. Exhibit 124 is essentially a summary of figures contained in Exhibits 132–143 and 128. Exhibits 55 and 56 are summaries which, according to plaintiff, show production losses sustained by U. S. Steel manufacturing subsidiaries as a result of the United Mine Workers' strikes in March–April 1948 and July 1948, respectively. Exhibits 94–97 are summaries of estimated production loss-

---

**6.** It appears from the record that plaintiff employed the terms "strike" and "work stoppage" almost interchangeably to characterize interruptions in production effected by labor-management disputes. Although it might seem at first blush that the term "work stoppage" might be used to refer to an interruption less serious than a "strike," such an impression is challenged by the fact that plaintiff's March–April 1948 interruption of approximately thirty-seven days' duration was classified as a "work stoppage" in Exhibit 55, plaintiff's summary of estimated production losses resulting from that interruption. According to plaintiff's witness Bracy D. Smith, a "work stoppage" in connection with "labor relations type matters" occurred when "for some reason the employees did not report for work or left because [of] some grievance or some incentive question, or for any reason." (531–532)

es resulting from "Coal Miners Strike—April 1 to May 29, 1946" (Ex. 94); "Coal Mine Work Stoppages [for] Period Ended June 27, 1947" (Ex. 95); "Strike Losses [during 1949]" (Ex. 96); and "Work Stoppages—Delaware Contract Companies [for period from] V–J Day through June 30, 1950" (Ex. 97).

This court has repeatedly attempted to elicit information from the parties in order to pinpoint the issues in this case. I believe that the ensuing account demonstrates that plaintiff and defendant have had adequate opportunities throughout the course of the proceedings to prepare and submit evidence for the court's consideration. The evidentiary value of the exhibits and testimony mentioned in this discussion is determined in the court's Findings of Fact, infra.

Leverne J. King, a U. S. Steel employee from 1929 to 1969, and Bracy D. Smith, an employee of plaintiff almost continuously since 1940, testified in somewhat general terms during the first week of the trial about U. S. Steel's procedures for the reporting of estimated production losses due to strikes and work stoppages.

King stated that on May 1, 1944 he was assigned to develop the cost accounting system for plaintiff's subsidiaries. On May 1, 1945, he became cost and statistics supervisor responsible for seeing that plaintiff's steel-producing subsidiaries "compiled data on a consistent basis." From May 1, 1945 through 1950, his basic function was to receive reports and records from U. S. Steel subsidiaries; to consolidate reports by companies; and to provide a service to plaintiff's central management in reporting "both the usual routine things and also the out of the ordinary things for their information and guidance, to have them improve their effectiveness." (653–655) For the period 1945 to 1950, the "collection of reports on strikes and work stoppages" was a regular procedure. (King, 659)

Smith testified that in the spring or summer of 1942 he was placed in charge of the accounting department section responsible for the recording of production, materials used and inventories at the Gary Works of plaintiff's Carnegie-Illinois subsidiary. During 1943, he was in charge of recording production and consumption for monthly statements at Gary. In October 1943, he was transferred to Pittsburgh, where he was concerned with "controls and planning and procedures in all of the Carnegie-Illinois plants." (425–427)

From the summer of 1944 to the spring of 1946, Smith served in the Navy. (427, 511) Upon his return from military duty, he worked in the cost planning bureau of the accounting department at Carnegie-Illinois headquarters in Pittsburgh. In February or March of 1947, he was assigned to the statistics division of the same department, where he worked through 1958. (511–512)

Smith testified that reports on losses caused by strikes and work stoppages were prepared in the Carnegie-Illinois organization "back to at least 1943," although he could not answer for the two-year period during 1944–1946 when he was in the Navy. (443–444)

Smith testified as to 1948 and 1949 that the Carnegie-Illinois accounting system "spelled out the requirement for all plants to report any work stoppages or any strike; the losses that occurred from it, man hours, production, and so forth." (445) It was part of his job to receive strike loss reports from each of the Carnegie-Illinois plants in 1948 and 1949. After receiving such reports, he "analyzed them to see that they were complete; that they appeared reasonable * * *." (446) If a figure "appeared to be out of line based on my knowledge of the operation, information that I had, then I would take it back to the plant and talk with them to assure myself that it was a reasonable figure" or have them "revise it and support it as to what we would show as the figure." (447) After the plant reports were compiled into a "total picture" for Carnegie-Illinois, a compilation was forwarded to King. (450)

With primary reference to the years 1948 and 1949, Smith stated that each production plant of plaintiff's Carnegie-Illinois subsidiary submitted a report on the effects of a particular strike or work stoppage; that there was a prescribed format for such reports; and that a set of instructions and a copy of the prescribed format were sent to the plants when the reporting procedures were initiated. (531, 533, 534, 537–538, 541, 544, 545, 547, 575–576)

When Smith was asked whether any instructions to the plants were available, he answered that he "might be able to find them." (576)

At the start of the second week of the trial, the court addressed eighteen written questions to plaintiff regarding accounting procedures and the availability of source documents. (888, 985–999; Court's Ex. 1, 991) In response to questions A–1 and A–2, plaintiff's counsel remarked that U. S. Steel had recently located original records dealing with work stoppages and that plaintiff would produce such records. (987) In response to question B–8, counsel stated that he believed U. S. Steel could produce samples of written instructions sent to each plant regarding accounting procedures utilized to estimate production losses due to strikes. (996)

King then testified that the figures on Exhibits 55 and 56 came from the chief accounting officers of plaintiff's subsidiaries. (1018–1019) The production loss estimates were used "by the commercial department in their customer relationships as to why certain orders weren't filled according to promises" and by management to explain to directors and stockholders effects on U. S. Steel's profits and loss situation caused by production losses. (1025–1026, 1030) The figures were also used during labor-management negotiations to remind a union that a prior work stoppage had caused certain production losses. (1033–1034)

After argument by the parties, the court admitted Exhibits 55 and 56 (summaries of estimated production losses for plaintiff's manufacturing subsidiaries for March–April 1948 and July 1948 coal strikes) into evidence. Exhibits 94–97 (summaries relating to production loss estimates for the years 1946–1950) were also admitted. (1037–1066, 1085–1087)

Subsequently, plaintiff's counsel proffered "instructions with respect to accumulating information about strikes and work stoppages." (1533) According to plaintiff's counsel, "[w]e did not know whether our copies of them were complete and whether these were the actual instructions in force on the relevant dates, but * * * if they are not these are actual instructions and the instructions on the relevant dates were reasonably close to these, there would be only minor changes from what we actually have found." The particular instructions included in Exhibit 119 "do bear dates and some of them are instructions going out," but plaintiff was not able to ascertain "whether those instructions were still in effect at the relevant time or whether perhaps they had been modified by additions or deletions * * *." (1533–1534)

Exhibit 119, admitted into evidence, contains certain letters dated March 5, 1942; August 24, 1943; August 28, 1943; December 13, 1943; and September 1, 1949. These letters, which do not present a complete picture of reporting procedures in effect at U. S. Steel production plants at particular times, may be described as follows:

1. From Director of Industrial Relations to Industrial Relations Executives, dated March 5, 1942, with heading "Strikes or Work Stoppages." This letter is referred to by its writer as a supplement to previous letters dated February 27, 1941 and October 21, 1941. Attached to the present letter is a note from a Statistical Supervisor to the Chief Accounting Officers of plaintiff's subsidiaries, with heading "Strikes or

Work Stoppages Form 'B'." The note reads:

"Supplementing our letter of October 21, 1941: Dues picketings, slowdowns and other types of union activity which cause a loss of output should be considered in the same sense as a strike for purpose of reporting statistics on Form 'B'. 'B' reports covering any such incidents since January 1, 1942 should be forwarded to this office promptly as possible. Procedures mentioned in our letter of October 21, 1941 are not changed. * * * "

2. From Statistical Supervisor to General Supervisor of Statistics Division for plaintiff's Carnegie-Illinois subsidiary, dated August 24, 1943, with heading "Strikes or Work Stoppages." This letter reminds Carnegie-Illinois plants to submit "Form B" reports promptly, and authorizes advance telephone reports to overcome any delays either in sending of written reports by plants or in delivery of such reports to headquarters.

3. From General Works Auditor of plaintiff's Carnegie-Illinois subsidiary to Works Auditors, dated August 28, 1943, with heading "Strikes, Work Stoppages, or Slow-Downs." It reads in relevant part:

"In order to satisfy a request from the American Iron and Steel Institute, [plaintiff has asked Carnegie-Illinois] to report all cases of strikes, work stoppages, or slow-downs as soon as they are started and to supply weekly statistical information concerning losses of man hours [and] production. * * * The notification to the Institute is made up of the following factors: 1. Name of plant[,] 2. Division or unit affected (complete or partial)[,] 3. Normal output of such division or unit per 8-hour shift in tons of products[,] 4. Cause of stoppage or strike (e. g., wages, working conditions, discipline of employees, jurisdictional disputes, etc.) * * * You should use the average production per 8-hour shift of the previous month for the normal output unless this figure is not representative, in which case, you should substitute a representative figure. * * * [In preparing subsequent reports after the early notification to the Institute at the start of a strike, work stoppage, or slow-down, record the] Estimated Loss of Production by Products. Enter here the estimated total production lost in both the direct and indirect divisions or units during the week covered by the report. * * * This procedure is to be made effective with the week ending September 3, 1943. * * * "

Enclosed with these instructions is a general format for use by Carnegie-Illinois plants, which format includes four proposed headings: "Form 'B' Report Number," "Division or Unit," "Estimated Total Man Hours Lost," and "Estimated Loss of Production by Products."

4. From Statistical Supervisor to General Supervisor of Statistics Division for plaintiff's Carnegie-Illinois subsidiary, dated December 13, 1943, with heading "Strikes or Work Stoppages." This letter informs Carnegie-Illinois plants that they may discontinue the practice of telephone or telegraph reports suggested in letter #2 above, but that "Form B" reports should still be submitted at the "earliest possible date."

5. From plaintiff's Cost and Statistics Division to plaintiff's subsidiaries, dated September 1, 1949, with heading "Instructions For Reports * * * Strike or Work Stoppage—Form 'B'." This letter contains instructions for preparation of "Form B" reports by the plants for "all strikes and work stoppages including dues, picketing, slowdowns, or other types of union activity which cause a loss of output." Under the subheading "Estimated Loss of Production," the letter advises:

"The loss in production caused by the strike or work stoppage is estimated and reported by product name

and net tons. Where losses are measured in number of base boxes, cubic feet, gallons, or other units, the net-ton equivalent is also shown. The tonnage estimate is obtained by multiplying the average tonnage per operating hour by the number of operating hours lost because of the strike. * * * It should be noted that tonnage reported as 'Direct Loss' and tonnage reported as 'Indirect Loss' are to be nonadditive to avoid pyramiding of primary semifinished, and finished goods, together under the common label of 'Total Steel Lost'."

These letters represent the only examples presented by plaintiff at trial of any written instructions transmitted to U. S. Steel's production plants. From this incomplete evidence of instructions, the court cannot determine with certitude which instructions were in force at particular plants at particular times.

Later in the trial, plaintiff's witness Raymond S. Ganem, a U. S. Steel employee since February, 1952 who now works in the accounting department, cost and statistics division (1445, 1460), testified that he had caused a search to be made of plaintiff's archives in response to the court's inquiries to plaintiff about its accounting procedures and the availability of source documents. (987, 1890)

Ganem stated that the search resulted in the discovery of "Form B" reports for each of the years 1941 to 1950. However, plaintiff was unable to find *all* the reports for the year 1941 and "certain of the other years." Exhibits 132–136, 138, 140–143, consisting of a volume of the available "Form B" reports for each of the years 1941 to 1950, and Exhibits 137 and 139, contemporaneous lists of the "Form B" reports for the years 1944 and 1945, were admitted into evidence. (1890–1896, 2382) Exhibits 124 and 128 were also admitted. (2382)

In a letter to the parties May 11, 1970, the court referred to Exhibits 132–143 and requested plaintiff to attempt preparation of an additional exhibit or exhibits setting forth summaries of estimated production losses for certain years, based on the available "Form B" reports contained in Exhibits 132–143. In response, plaintiff proposed Exhibits 4–7. (See Court's Exhibit 5, May 11, 1970; Plaintiff's letter to the court, May 13, 1970)

In a letter to the parties May 18, 1970, the court stated:

"A study of these proposed exhibits and Exhibits 132–143 reveals that production losses (due to strikes and work stoppages) were reported in various forms. Exhibits 132–143 are said to include each available report (or 'Form B') prepared by each plant of each manufacturing subsidiary as an estimate of production losses due to strikes or work stoppages during the years 1941 to 1950. The various Form B reports appear to record estimated production losses in at least four different contexts: (1) a production loss of ingots only; (2) a production loss of actual products only; (3) a production loss of ingots and actual products; (4) a production loss of ingots, together with product loss figures, which figures may or may not be intended as a projection of potential product losses which would be expected to result from the specified loss of ingots. * * * In order to analyze the approximate production losses due to strikes or work stoppages in a particular year or years *in comparison with* the approximate production losses due to strikes or work stoppages in another particular year or years, the court believes that a comparative standard as nearly uniform as possible is required for each of the years 1941 to 1950. Plaintiff has not attempted to propose a basis for evaluating the different types of reports and totals included in Exhibits 132–143 and mentioned above. Since, as plaintiff has stated, these exhibits constitute 'underlying documents,' the documents must be utilized as primary sources for determining reported production losses due to strikes and work stoppages in the years 1941 to 1950.

* * * Plaintiff is asked to submit a proposed exhibit or exhibits attempting to set forth, on the basis of Exhibits 132–143, the estimated production losses due to strikes and work stoppages for each of the years 1941 to 1950 by a reconciliation and explanation of the varying types of Form B reports previously noted. * * * Plaintiff is asked to specify the extent to which the original Form B reports for each year are included in Exhibits 132–143. For example, plaintiff may propose to demonstrate that the total of the available Form B reports is comparable to figures in contemporaneous summaries or annual reports. * * * Insofar as it appears that certain Form B reports are not available, plaintiff may propose in detail which, if any, documents it wishes the court to consider as a means of filling in gaps. * * *" (Court's Exhibit 6, May 18, 1970)

In response, plaintiff proposed Exhibits 8–10 and told the court that these exhibits included:

" * * * a reconciliation and explanation of the Form B reports for the years 1944 and 1945, for which years there were available Exhibits 137 and 139, as well as 138 and 140, which enabled the explanation to be made. Plaintiff has attempted to make exhibits of a similar nature for other years. These attempts, however, are based in part on conjecture. * * * To the best of plaintiff's knowledge, the files of Form B reports, * * * together with other documents marked in evidence, constitute all of the presently available records concerning work stoppages of United States Steel Corporation and its subsidiaries for the years 1941 through 1950, with the exception of the fact that there are references to work stoppages and the resulting tonnage losses in the Comptroller's letters * * *, the Annual Reports * * *, and similar conclusory reports which have been excluded from evidence. So far as plaintiff has been able to determine by reconciliation, the Form B Reports are substantially complete for each of the years, with the exception of 1941, 1946 and 1948. With respect to the year 1941, only a portion of the Form B Reports has ever been found. The 1946 Form B Reports add up to 500,-000 tons less than the total reported on Exhibit 128 for that year. This difference centers principally on the losses reported for the 1946 steel strike. Apparently later reports of that strike are missing from this set of copies. * * *" (Plaintiff's first letter to the court, May 21, 1970)

In a later letter, plaintiff referred to the letter above and stated that "Form B" reports for certain subsidiaries were not available for the years 1944 and 1945. (Plaintiff's second letter to the court, May 21, 1970)

On May 22, 1970, the record was reopened for argument and, at plaintiff's request, for additional testimony by its witness Ganem. I discussed with the parties an excerpt from one of plaintiff's post-trial memoranda, to wit:

"It does not now seem to counsel for plaintiff that there is need for additional evidence, but should there be any points on which the Court foresees a possible failure of proof for lack of evidence, as opposed to a decision on the evidence offered, plaintiff's counsel request the unusual courtesy of having any such areas revealed by the Court because counsel do not want their reluctance unnecessarily to over-burden the record to redound against the substantive rights of their client." (Plaintiff's Memorandum of May 11, 1970, p. 2 [in Response to the Court's letter of May 6, 1970])

[THE COURT:] "The time for that, I think, has passed. We have endeavored here to ascertain clarifications, but each side, both plaintiff and defendant, will have to weigh the evidence which it has submitted and we must determine the issues on the basis of the actual submissions which have been made." (3597)

Plaintiff was asked if it wished to submit any documents as a means of filling in gaps resulting from the unavailability of certain "Form B" reports (the source records, prepared by U. S. Steel production plants, which contain estimates of production losses due to particular strikes or work stoppages).

Plaintiff's counsel, apparently alluding to conclusory documents such as annual reports, stated that certain documents of this nature had not been admitted into evidence. The court then reiterated that plaintiff had the opportunity to submit any papers as a proposed means of filling in gaps. (3598–3600) By letter to the court, plaintiff then reported that "it has again reviewed its files at length and has no additional documentary materials which it can submit in this connection." (Plaintiff's letter to the court, May 26, 1970)

During the course of Ganem's testimony on May 22, 1970, Exhibits 4–10 were admitted into evidence.[7] Exhibits 4 and 5 are attempts at summarizing estimated production losses due to strikes and work stoppages in terms of "ingots" and "total iron and steel" for manufacturing subsidiaries of U. S. Steel in the years 1941 through 1945. Exhibits 6 and 7 are, for the most part, attempts at summarizing the figures contained on the available "Form B" reports for 1943 and 1945. Exhibit 8 contains certain production statistics for the years 1941 to 1950. Exhibits 9 and 10 represent attempts at reconciliation of the estimated production loss figures included in varying contexts on the "Form B" reports available for the years 1944 and 1945.

After hearing the testimony of the parties and examining the pleadings, the exhibits and the proposed findings of fact and conclusions of law, this court makes the following findings of fact regarding the issues raised by plaintiff's contentions that it is entitled to application of § 442 for the years 1948 and 1949:

## FINDINGS OF FACT

1. The court has jurisdiction of this action pursuant to 28 U.S.C. § 1346(a)(1).

2. Plaintiff United States Steel Corporation is a corporation organized under the laws of Delaware in September 1965 as "U. S. Steel Company," and is the successor by merger on January 1, 1966 to United States Steel Corporation, a corporation organized under the laws of New Jersey. (Stipulation, 171)

3. On November 15, 1951, U. S. Steel, for itself and its subsidiaries, timely filed a consolidated federal income and excess profits tax return for the calendar year 1950. The tax due, as shown on the return, was timely paid in four installments during 1951. Thereafter, as a result of audits by the Internal Revenue Service, additional tax for 1950 was assessed and paid, together with interest thereon, and adjustments were made in the 1950 tax due to interim LIFO allowances. (Stipulation, 171)

4. By successive agreements between the taxpayer and the Internal Revenue Service, the time for assessment against plaintiff of additional federal income and excess profits tax for 1950 was extended to June 30, 1966. Additional payments of tax and assessed interest were completed on or about June 22, 1965. (Stipulation, 171–172; Pretrial Order No. 1, Ex. A; Court's Ex. 2)

5. On June 29, 1965, U. S. Steel filed a timely claim for refund of federal income and excess profits tax paid for 1950, and a refund of assessed interest paid on assessments of additional income and excess profits tax for 1950. (Stipulation, 172; Pretrial Order No. 1, Ex. B)

6. On August 4, 1965, the Internal Revenue Service forwarded to U. S. Steel by certified mail a notice of re-

---

7. Exhibits 4–10, admitted into evidence and dated May 22, 1970, are to be distinguished from other like-numbered exhibits either admitted into evidence or marked for identification earlier in the course of the trial. (3607–3608)

jection of plaintiff's refund claim. (Stipulation, 172)

7. U. S. Steel and its subsidiaries have been engaged principally in the integrated business of making and selling iron and steel products since 1901. (Stipulation, June 10, 1970)

8. The steel-making process generally consists of several production steps. The principal raw materials used in the manufacture of steel are coal, iron ore and limestone, each of which is mined at U. S. Steel's own mines. After coal is mined, it is charged into coke ovens to produce coke. Coke, iron ore and limestone are then charged into a blast furnace to produce iron (or hot metal).[8] Iron, with the principal addition of scrap, is then charged into the open-hearth furnace (or other facilities) to produce ingots,[9] the first solid form of steel. Ingots are then processed further into semi-finished products (slabs, blooms and billets), which may be shipped to customers or processed further into finished products (plate, sheet and strip; structural steel and rails; and rods, bars, seamless pipes and tubes) for shipment to customers. (See Ex. 24; 400–404, 617–618)

9. During the years 1933–1950, the major subsidiaries of U. S. Steel (engaged in the production and manufacture of coal, coke, iron, ingots, semi-finished products and finished products) were as indicated in the following table:

### MAJOR PRODUCTION SUBSIDIARIES OF U. S. STEEL: 1933–1950

| Subsidiary (and years) | Coal | Coke | Iron | Ingots | Semi-finished Products | Finished Products |
|---|---|---|---|---|---|---|
| H. C. Frick Coke (1933–1950) | X | X | | | | |
| National Mining (1933–1943; absorbed by H. C. Frick 1/15/43) | X | | | | | |
| Sharon Coal & Limestone (1933–1940; absorbed by National Mining 12/31/40) | X | | | | | |
| U. S. Coal & Coke (1933–1950) | X | | | | | |
| U. S. Fuel (1933–1940; absorbed by U. S. Coal & Coke 12/31/40) | X | | | | | |
| Carnegie-Illinois (1933–1950) | | X | X | X | X | X |

---

8. Although various exhibits refer to "iron," "hot metal," "pig iron," or "blast furnace product," it is sufficient for present purposes to state that these terms are similar. For convenience, the court hereinafter will use the terms "iron" or "hot metal."

9. Plaintiff has referred in certain exhibits to "ingots" and in others to "ingots and castings" or "ingots and steel castings." When "steel castings" have been listed under a separate total, the total has been small. For purposes of convenience, the court will refer hereinafter only to "ingots," while including totals for "steel castings" under the category of "ingots."

MAJOR PRODUCTION SUBSIDIARIES OF U. S. STEEL: 1933–1950

| Subsidiary (and years) | Coal | Coke | Iron | Ingots | Semi-Finished Products | Finished Products |
|---|---|---|---|---|---|---|
| American Sheet & Tin Plate (1933–1936; merged with Carnegie-Illinois 6/1/36) | | | | X | X | X |
| American Steel & Wire (1933–1950) | | X | X | X | X | X |
| Cyclone Fence (1933–1940; dissolved 12/23/40) | | | | | | X |
| Columbia Steel (1933–1946) | X | X | X | X | X | X |
| (1947–1950; coal, coke and iron production facilities sold to Geneva Steel in October, 1946) | | | | X | X | X |
| National Tube (1933–1950) | | X | X | X | X | X |
| Tubular Alloy Steel (1941–44; assets transferred to National Tube 9/26/44) | | | | | | X |
| Tennessee Coal & Iron (1933–1950) | X | X | X | X | X | X |
| Geneva Steel (1946–1950; government-owned production facilities at Geneva, Utah purchased by U. S. Steel 6/19/46) | X | X | X | X | X | X |
| American Bridge (1933–1950) | | | | | | X |
| Canadian Bridge (1933–1937; sold as of 9/1/37) | | | | | | X |
| Oilwell Supply (1933–1950) | | | | | | X |
| U. S. Steel Supply (1933–1950; known before 1942 as Scully Steel Products) | | | | | | X |
| U. S. Steel Products (1939–1950; known before 9/23/43 as Boyle Mfg.) | | | | | | X |

MAJOR PRODUCTION SUBSIDIARIES OF U. S. STEEL: 1933–1950

| Subsidiary (and years) | Coal | Coke | Iron | Ingots | Semi-Finished Products | Finished Products |
|---|---|---|---|---|---|---|
| Federal Shipbuilding & Dry Dock (1933–1948; yard transferred to U. S. Navy 12/31/48) | | | | | | X |
| Virginia Bridge (1936–1950) | | | | | | X |
| Gerrard Steel Strapping (1942–1950) | | | | | | X |
| Consolidated Western (1948–1950; acquired 8/31/48) | | | | | | X |

(Stipulation, June 9, 1970; Court's Ex. 7)

———◆———

10. During the years 1933 through 1939, U. S. Steel's production facilities were affected by "some strikes and other labor difficulties," although plaintiff apparently did not maintain statistical records in those years indicating the approximate extent to which such occurrences may have interrupted the manufacture of iron and steel products by plaintiff's subsidiaries. (Exs. 207, 208; 2732)

11. During the year 1941, U. S. Steel began to instruct administrative officials at the production plants of its subsidiaries to prepare reports estimating manhour losses and production losses due to any strikes or work stoppages. These papers, known as "Form B" reports, were transmitted by the subsidiaries to central management. The court cannot determine from plaintiff's evidence exactly when each production plant of each subsidiary began to prepare and submit "Form B" reports for strikes or work stoppages, although it appears that almost all plants of the major subsidiaries were submitting the reports, when appropriate, by 1942 or 1943. (Ex. 119; 1533–1534; Exs. 141, 142, 143; 444, 575)

12. The only relevant years prior to 1948 for which plaintiff has presented any statistical evidence regarding strike losses are 1941, 1942, 1943, 1944 and 1945. (See Exs. 138, 140–143)

Since plaintiff started in 1941 to record estimates of production losses due to strikes, the court believes that a determination of whether the 1948 strikes were "unusual" within the meaning of § 442 should be based on a comparison of (a) alleged impact of the 1948 strikes on production and net shipments of iron and steel products; and (b) a reasonable approximation of the impact of strikes in 1941, 1942, 1943, 1944 and 1945 on production and net shipments of iron and steel products.

13. The appropriate loss indicator "for the purposes of this action," by agreement of the parties, is *net* shipments. (Plaintiff's first letter to the court, May 21, 1970; 3138–3139, 3625–3626) In the steel-making industry, production and total shipments are generally correlative. (3006, 3011, 3122, 3123, 3142) The court finds that a loss of production would have been comparable generally to a loss of total shipments.

U. S. Steel has been engaged principally in the "integrated business of mak-

ing and selling *iron* and steel products since 1901." (Finding of Fact #7) (Emphasis added) For the most part, however, plaintiff has referred during the trial to production and shipments of *steel* products, with only occasional mention of possible shipments of iron products. See Ex. 16 ("steel products"— shipments); Ex. 8—May 22, 1970, p. 2 ("Steel Producers Shipments of Steel Products"—1941–1950)

Although iron is charged into an open-hearth furnace (or other facility) with scrap to produce ingots (Finding of Fact #8), one witness, discussing certain production facilities of a U. S. Steel subsidiary in the year 1950, seemed to state that hot metal (iron) produced at those facilities was "sold as hot metal and does not go into the production of ingots at United States Steel Corporation." (1908– 1909) It thus appears that iron or hot metal is processed further into ingots and then into steel products, although to some unspecified extent iron or hot metal might be processed and sold as iron product rather than being processed further into ingots and then sold as steel product.

I shall proceed on the assumption that most of the iron or hot metal (estimated to have been lost due to strikes in the years 1941–1945) would have been processed further into ingots and then into steel products.[10] Specified production losses of *iron* or *hot metal* will therefore be excluded from further consideration. To the extent that production loss estimates can be itemized only as a combined total of iron, ingots and steel products, the court will determine the range of possibilities regarding production losses of steel products. In other words, a combined total might conceivably rep-

resent all iron losses, at one extreme, or all steel product losses, at the other.

In an effort to obtain a reasonable approximation of potential strike losses in terms of net shipments of steel products, the court will analyze the evidence submitted for the relevant years (i. e., 1941– 1945, 1948) and apply known statistical relationships for those years indicating (a) the average yield of net shipments of steel products from ingot production, and (b) the average yield of net shipments of steel products from total shipments of steel products.

Plaintiff's allegations of 1948 losses in production and shipments of steel products due to two 1948 strikes by the United Mine Workers [11] will be discussed presently. The court will then analyze the evidence presented for the years 1941–1945 in order to determine whether the strikes in 1948 were "unusual" within the meaning of § 442(a) by reason of their alleged impact on production and net shipments of steel products.

### STRIKES DURING 1948

14. On March 15, 1948, the United Mine Workers commenced a strike which shut down plaintiff's coal-producing facilities. The strike terminated on or about April 22, 1948. About July 5, 1948, the United Mine Workers commenced a strike which again shut down plaintiff's coal-producing facilities. This strike terminated on or about July 14, 1948. (Stipulation, 176)

As a result of these strikes, plaintiff alleges that it suffered losses in production of coal, coke, iron, ingots and "equivalent finished products." The allegation of lost production of ingots and

---

10. Although I have decided to disregard specified production losses of iron or hot metal hereinafter, I must state that plaintiff has not precluded the possibility that production losses of iron or hot metal due to strikes during 1941–1945 resulted in shipment losses of iron products. The decision to disregard iron or hot metal production losses is an example of the court's efforts to minimize the effect of

any alleged duplication in reporting of production loss figures by U. S. Steel. See Findings of Fact #18–#23 and analysis after Findings of Fact #23, #24, #25; Findings of Fact #26– #39)

11. As previously noted, U. S. Steel has limited its strike loss claims for 1948 to two strikes. (1280–1281)

"equivalent finished products" is based on the claim that the strikes not only shut down plaintiff's coal-producing facilities but also interrupted production of coke at coke ovens, iron at blast furnaces, and most importantly, ingots (the first solid form of steel) and steel products at U. S. Steel's steel-making facilities. (See Finding of Fact #8 for a general summary of production steps in the steel-making process)

15. U. S. Steel did not submit a summary based directly on the available "Form B" reports for the year 1948 contained in Exhibit 134.

Instead of relying primarily on figures contained in available "Form B" reports for 1948, U. S. Steel relies on figures set forth in Exhibit 55 ("Production's Losses Resulting from Coal Miners' Work Stoppage Starting March 15,

1948 * * * final data as submitted by the companies * * *," summary dated May 21, 1948) and Exhibit 56 ("Production Losses Resulting from Coal Miners' Work Stoppage Starting July 6, 1948 * * * the production losses in net tons * * *," summary dated July 22, 1948).

According to plaintiff's witness King, the figures in these exhibits came from the chief accounting officers of plaintiff's subsidiaries. (1018–1019) However, plaintiff has failed to produce all of the particular chief accounting officers' reports which supposedly were the source of the figures placed in Exhibits 55 and 56. Since plaintiff has been unable to provide the source documents from subsidiaries, the court has considered U. S. Steel's allegations based on certain figures contained in Exhibits 55 and 56, as follows:

### PLAINTIFF'S ALLEGED PRODUCTION LOSSES DUE TO THE TWO 1948 STRIKES: EXHIBITS 55 AND 56

*The March-April Strike*

| Subsidiary | Ingots | "Equivalent Finished Products" |
|---|---|---|
| American Steel & Wire | 1,882 | 1,328 |
| Carnegie-Illinois | 251,141 | 183,333 (12) |
| Columbia Steel | 1,639 | 3,828 |
| Geneva Steel | 126,390 | 85,185 |
| National Tube | 21,293 | 14,013 |
| Tennessee Coal & Iron | 100,641 | 70,448 |
| Totals for March-April Strike .......... | 502,986 | 358,135 (Exhibit 55) |

\* \* \* \* \* \* \* \* \* \*

*The July Strike*

| Subsidiary | Ingots | "Equivalent Finished Products" |
|---|---|---|
| Carnegie-Illinois | 65,977 | 48,163 |
| National Tube | 10,893 | 7,047 |
| Totals for July Strike ................. | 76,870 | 55,210 (Exhibit 56) |

\* \* \* \* \* \* \* \* \* \*

| Subsidiary | Ingots | "Equivalent Finished Products" |
|---|---|---|
| Totals for both strikes ................. | 579,856 | 413,345 |

---

12. The relationship between the ingot figure and the "equivalent finished products" figure for Columbia Steel seems odd when contrasted with the relation-

16. Plaintiff has failed to provide the actual instructions which might have been utilized in 1948 by employees at individual plants or by the chief accounting officers of the subsidiaries as the basis for preparation of production loss reports. Therefore the court cannot determine with certainty whether the "equivalent finished products" figure was meant to signify a loss in production, total shipments or net shipments.

---

King stated that "as I understand equivalent finished product, those were calculated [on Exhibits 55 and 56] by taking the normal ratio of finished products to ingots." He added that the figures were supplied by the subsidiaries. (1195, 1233) Apparently, the chief accounting officers of the subsidiaries reported the estimated impact of the two 1948 strikes by considering specific production losses only in terms of ingots and then projecting the ingot loss figures into losses of steel products which might have been expected to result from the loss of ingot production. Although the headings of both Exhibits 55 and 56 refer to losses in production, the court will assume that the 413,345 ton figure was intended by plaintiff to be an alleged estimate of losses of net shipments of steel products.[13] In view of the court's determination that the 1948 strikes were not "unusual" *even* if the 413,345 ton figure alleged by plaintiff is assumed to be correct, it is unnecessary to consider further defendant's arguments that the 413,-345 ton figure is excessive. (See Findings of Fact #43–#47)

17. For the year 1948 the demand for steel was high, and plaintiff could have sold all the steel which it could have shipped. U. S. Steel's net shipments for the year were 21,106,747 tons of steel products. (Stipulation, 202–203; Ex. 8 —May 22, 1970, p. 1)

## STRIKES DURING 1941, 1942, 1943, 1944 & 1945

18. The court finds that estimates of production losses due to strikes in each of the years 1941 to 1945 are included in the record from the following sources:

(a) Available "Form B" reports for each of the years (Exs. 138, 140–143); Production loss figure totals apparently include losses of iron, ingots and steel

---

ships between the figures for the other subsidiaries listed on Exhibits 55 and 56. This seeming oddity was the subject of some spirited discourse during cross-examination of King:

"Q Isn't the traditional relationship or wasn't the traditional relationship in 1948 between finished product equivalent and ingots approximately 70 per cent?

"A Overall, yes, sir.

＊　＊　＊　＊　＊

"Q Mr. King, will you tell me, sir, how you can create 3800 tons of finished product out of 1800 tons of ingots?

"A I'm not God.

"Q Neither am I, sir. Perhaps it's a typographical error, Mr. King, perhaps the columns are reversed. Do you think that is possible?

"A I was satisfied at that time.

"Q I see, sir. Are you still satisfied now?

"A Yes, sir.

"Q It doesn't raise any questions in your mind, sir?

"A No, sir.

"Q You don't think it was a typographical error, sir?

"A No sir." (1234–1236)

Later, King attempted to explain on redirect that he thought the composite totals for all subsidiaries were correct, and that the Columbia Steel figures might have included some tonnage otherwise includible under the name of another subsidiary.

13. The court notes that the indicated loss of 413,345 tons of "equivalent finished products" amounts to approximately 71.3% of the estimated ingot production losses due to the two 1948 strikes (i. e., 579,856 tons of ingots). As previously stated, production and total shipments (public and affiliated) are comparable. For the year 1948, the yield of *total* shipments of steel products from ingot production was 81.3%, while the yield of *net* shipments of steel products from ingot production was 72.2%. (Ex. 8, May 22, 1970, p. 1)

It thus seems reasonable to consider that the 413,345 ton figure was meant to indicate the potential loss of net shipments of steel products.

products. Total losses summarized on Exhibit 5—May 22, 1970, column 3; Exhibit 6—May 22, 1970, for the year 1943; Exhibits 7, 10—May 22, 1970, for the year 1945; Exhibit 9—May 22, 1970, for the year 1944.

(b) Contemponaneous summary sheets listing the "Form B" reports submitted for the years 1944 and 1945 (Exs. 137, 139); On Exhibit 137, the list of production losses for each plant for 1945 does not include totals for year, but the figures are totaled and reported on Exhibit 124, p. 6, column "(C)"; on Exhibit 139, the list of production losses in "steel" for 1944 includes totals for year, and the same total is reported on Exhibit 124, p. 7, column "(C)."

(c) Summaries of "estimated tonnage lost" in terms of "steel" due to "strikes or slowdowns causing loss of production" for the years 1942–1945. (Ex. 128, p. 2—dated March 5, 1947, U. S. Steel Cost and Statistics Division)

(d) Excerpts from U. S. Steel's annual reports for the years 1941, 1943, 1945; read into the record during cross-examination of plaintiff's witness Roger M. Blough. (121, 125, 128) The figures for the years 1941–1945 are reported in terms of "steel production" or "loss of steel tonnage."

19. The estimates of lost production tonnage due to strikes as reported from the above sources (a), (b), (c) and (d) in Finding of Fact #18 are listed herewith for the respective years:

ESTIMATED PRODUCTION LOSSES DUE TO STRIKES, REPORTED BY U. S. STEEL FOR THE YEARS 1941–1945
(Source: Finding of Fact #18(a), (b), (c) & (d))

| Year | Source (a)—combined total of iron, ingots and steel products | Source (b)— "steel" | Source (c)— "steel" | Source (d)— "steel tonnage" |
|---|---|---|---|---|
| 1941 | 88,257 (incomplete; Ex. 5: May 22, 1970, col. 3; Ex. 143) | — | — | "about" 300,000 (121) |
| 1942 | 43,112 (Ex. 5: May 22, 1970, col. 3; Ex. 142) | — | 52,715 | 53,000 (125) |
| 1943 | 343,957 (Ex. 5: May 22, 1970, col. 3; Ex. 141) | — | 317,998 | 318,000 (125) |
| 1944 | 530,642 (incomplete; Ex. 9: May 22, 1970, p. 3; 3629–3630; Ex. 140) | 871,391 (Ex. 139) | 871,391 | 871,000 (128) |
| 1945 | 1,859,978 (Ex. 7: May 22, 1970, p. 1) or 1,860,034 (Ex. 10: May 22, 1970, p. 2; 3630–3632; Ex. 138) | 1,868,522 | 1,868,522 | 1,868,000 (128) |

20. A review of the available "Form B" reports for 1943–1945, plaintiff's detailed summaries of the "Form B" figures for 1943 and 1945, and plaintiff's

general summary of the "Form B" figures for 1944 reveals that the totals of production loss estimates for 1943, 1944 and 1945 included losses for iron, ingots and specified steel products. (For the year 1943, see Ex. 141; Ex. 6, May 22, 1970, pp. 1–13. For the year 1944, see Ex. 140; Ex. 9, May 22, 1970. For the year 1945, see Ex. 138; Ex. 7, May 22, 1970, pp. 1–10; Ex. 10, May 22, 1970.)

21. U. S. Steel did not submit exhibits summarizing or explaining the available "Form B" reports for the years 1941 and 1942. Referring to the summaries submitted for the years 1943–1945, plaintiff told the court that it had "attempted to make exhibits of a similar nature for other years [including 1941 and 1942]. These attempts, however, are based in part on conjecture." Plaintiff also noted that "only a portion of the Form B Reports has ever been found" for the year 1941. (Plaintiff's first letter to the court, May 21, 1970)

22. When the speciified production loss estimates for iron or hot metal are subtracted from the summarized production loss estimate totals in Finding of Fact #19, the following picture emerges:

## 1941

Production loss estimate totals ...............approximately 300,000 tons

Apparently, total includes iron or hot metal, ingots and specified steel products; "Form B" reports incomplete (Finding of Fact #19: compare columns (a) and (d)); no detailed summary of available "Form B" reports provided by plaintiff; plaintiff only notes that 88,257 tons of estimated production losses indicated on the available "Form B" reports included 18,715 tons of ingots. (Exs. 4, 5, May 22, 1970)

## 1942

Production loss estimate totals ...............approximately 53,000 tons

Apparently, total includes iron or hot metal, ingots and specified steel products; "Form B" reports substantially complete (Finding of Fact #19: compare columns (a) and (c), (d)); no detailed summary of available "Form B" reports provided by plaintiff; plaintiff only notes that 43,112 tons of estimate production losses indicated on the available "Form B" reports included 9,441 tons of ingots. (Exs. 4, 5, May 22, 1970)

## 1943

Production loss estimate totals .................343,957 tons

Less specified production loss estimate for hot metal (Ex. 6, May 22, 1970, p. 1) ............ 19,036

Production loss estimate total for ingots (approx. 48,000) and steel products (approx. 277,000) (Ex. 6, May 22, 1970, p. 1) ..................................... 324,921 tons

"Form B" reports apparently complete (Finding of Fact #19: compare columns (a) and (c), (d)); detailed summary of available "Form B" reports provided by plaintiff. (Ex. 6, May 22, 1970, pp. 1, 2–13)

## 1944

Production loss estimate totals ................871,391 tons

    Less estimated losses on four "Form
B" reports for "ore loss," "crushed
slag loss," "coke loss," "slag loss"
(Ex. 9, May 22, 1970) ...........105,603

    Less specified production loss esti-
mate for hot metal (Ex. 9, May 22,
1970) .........................117,793 ..223,396

Production loss estimate total for ingots
(at least 118,721 tons), steel products (at
least 294,128 tons) and combined total of
iron, ingots and steel products (approx.
235,000 tons) (Ex. 9, May 22, 1970, Find-
ing of Fact #19) .................................. 647,995 tons

"Form B" reports incomplete (Finding of Fact #19: compare
columns (a) and (b), (c), (d)); general summary of available
"Form B" reports provided by plaintiff. (Ex. 9, May 22, 1970)

## 1945

Production loss estimate totals ........approx. 1,860,000 tons

    Less specified production loss esti-
mate for hot metal (Ex. 7, May 22,
1970, p. 1 (396,658); Ex. 10, May
22, 1970 (398,633)) .............approx. 397,500

Production loss estimate total for ingots
(approx. 478,500) and steel products (ap-
prox. 984,000) (Exs. 7, 10, May 22, 1970) .................1,462,500 tons

"Form B" reports substantially complete (Finding of Fact
#19: compare columns (a) and (b), (c), (d)); detailed sum-
mary of available "Form B" reports provided by plaintiff, to-
gether with detail of losses from April, 1945 Carnegie-Illinois
strike in an administrative report. (Plaintiff's second letter
to the court, May 21, 1970; Exs. 7, 10, May 22, 1970)

23. The detail in Finding of Fact #22 relating to production loss
figures involving *ingots* and *steel products* for the years 1941–1945 may
be further summarized accordingly:

ESTIMATED PRODUCTION LOSSES DUE TO STRIKES, 1941–1945
    (broken down into three types of categories: (1) specified ingot loss-
      es; (2) specified steel product losses; and (3) combined totals
        which apparently include iron, ingots and steel products)

## 1941

Specified ingot losses—production ..................... 18,715 tons
Combined total of production losses of iron, ingots and
steel products—no breakdown by loss category ......approx. 281,000

### 1942

Specified ingot losses—production ....................... 9,441

Combined total of production losses of iron, ingots and
steel products—no breakdown by loss category .......approx. 43,500

### 1943

Specified ingot losses—production .................approx. 48,000

Specified steel product losses—production ...........approx. 277,000

### 1944

Specified ingot losses—production ....................... 118,721

Specified steel product losses—production ................. 294,128

Combined total of production losses of iron, ingots and
steel products—no breakdown by loss category .......approx. 235,000

### 1945

Specified ingot losses—production .................approx. 478,500

Specified steel product losses—production ...........approx. 984,000

———◆———

Despite the fact that the production loss estimates cited in Finding of Fact #19, columns (c) and (d), were reported yearly to U. S. Steel stockholders and summarized in a management report prepared by U. S. Steel's Cost and Statistics Division (dated March 5, 1947), plaintiff suggests that the figures should not be accepted at face value because of possible "duplication" or "pyramiding." (1919, 1922, 1924; 3610–3611, 3614–3615, 3632–3646) Although some of plaintiff's references are indefinite and ambiguous on this score, the court has scrutinized the record presented in order to evaluate the possibility of overlapping figures and minimize the effect of any such overlapping. (See Finding of Fact #13 and subsequent analysis; Finding of Facts #18–#23; Finding of Fact #24 and subsequent analysis; Finding of Fact #25 and subsequent analysis; Findings of Fact #26–#39)

The court next turns its attention to the reported estimates of production losses of ingots and steel products.

24. The available "Form B" reports for the years 1941–1945 record estimates of production losses (of ingots and steel products) in varying contexts, including (1) a production loss of ingots only; (2) a production loss of steel products only; and (3) a production loss of ingots and steel products. (See Exs. 138, 140–143)

With apparent reference to the third type mentioned above, plaintiff seems to assert that in some instances a production plant may have recorded an estimate of *actual* ingot production lost and then recorded a *projection* of potential steel product losses which would be expected to result from the specified loss of ingots. An example will illustrate:

Suppose that production of 10,000 tons of ingots was lost due to a strike. The 10,000 tons of ingots might have been processed further into 8,500 tons of semi-finished products. The 8,500 tons of semi-finished products might have been sold to a customer or processed further into 7,000 tons of finished products, which might then be sold to a customer.

U. S. Steel theorizes that somehow a production plant or production plants may have reported that the production loss due to a strike as illustrated above was not just 10,000 tons of ingots but a

total of 25,500 tons (i. e., 10,000 tons of ingots plus 8,500 tons of semi-finished products plus 7,000 tons of finished products). In support of its theory, U. S. Steel points to three "Form B" reports by its subsidiary Tennessee Coal & Iron during the year 1945. (See 3628–3646; Ex. 138) [14] One of the "Form B" reports, undated, is headed "Summary Showing Total Effect of Work Stoppage at Coal Mines" for certain plants during a particular period. This "Form B" report is apparently a summary of the production loss estimates contained on the two other reports, which were submitted by Ensley Works and Fairfield Steel Works of Tennessee Coal & Iron. After looking at the figures on the summary "Form B" report, plaintiff's witness Ganem stated that he could "almost" detect a statistical relationship (between the reported losses of ingots and steel products) to indicate the possible reporting of overlapping figures. At another point, Ganem commented that "there are a great deal of problems in trying to [tie] the [Form B reports] together at this date unless you were intimately familiar with the operations as they existed at that time * * *." (3629)

25. Aside from Ganem, who did not become a U. S. Steel employee until 1952 (1460, 3413), plaintiff produced no witness to attempt to reconcile the different categories of production losses.

---

A letter from U. S. Steel's Cost and Statistics Division to plaintiff's subsidiaries, dated September 1, 1949, refers to estimates of production losses due to strikes and states that such estimates

"are to be nonadditive to avoid pyramiding of primary, semifinished, and finished goods, together under the common label 'Total Steel lost'." (See Ex. 119, letter #5, discussed in "The Nature of Plaintiff's Evidence Relating To Estimates of Production Losses Due to Strikes," supra)

In an analysis after Finding of Fact #13, the court decided to disregard estimated production losses of *iron or hot metal* because most of this material apparently is processed further into steel ingots and then steel products (rather than being sold to customers as iron or hot metal). With reference to estimated production losses of *ingots and specified steel products*, the court believes that plaintiff's evidence in support of its theory of duplication in reporting is at best sketchy. Nevertheless, the court has undertaken an analysis of the available "Form B" reports for the years 1943 and 1945,[15] which reports have been broken down in terms of types of production loss estimates, such as (1) ingots only, (2) specified steel products only, and (3) ingots as well as specified steel products. As to those "Form B" reports which indicate a loss of ingots only or specified steel products only, it is reasonable in most instances to assume an absence of duplication of figures. As to those "Form B" reports which indicate a loss of ingots as well as a loss of specified steel products, it is quite possible that the losses were distinct. However, if a study of any such "Form B" report suggests even a fair possibility of any duplication or pyramiding, the court will disregard figures so as to achieve a reasonable approximation for 1943 and 1945

---

14. It might be noted that for the year 1945, there were more than two hundred other individual "Form B" reports submitted by U. S. Steel as part of Exhibit 138. In support of its theory of duplication, plaintiff limited its presentation to the three selected "Form B" reports mentioned.

15. As already noted, plaintiff submitted no summaries of available "Form B" reports for the years 1941 or 1942. For 1944, U. S. Steel submitted Ex. 9, May 22, 1970,

which is less detailed than the exhibits for 1943 (Ex. 6, May 22, 1970) and 1945 (Exs. 7, 10, May 22, 1970). The figures in Finding of Fact #19 demonstrate that certain "Form B" reports for 1944 dealing with considerable production loss tonnage are not available. Accordingly, production losses for 1941, 1942 and 1944 can be broken down only into figures representing a range of possibility for production losses of steel products. (See Findings of Fact #22, #23, #40)

of the production loss of ingots and specified steel products.[16]

26. Exhibit 6, May 22, 1970, consists of a thirteen-page listing of the contents of the available "Form B" reports for the year 1943. The U. S. Steel manufacturing subsidiaries for which "Form B" reports are included are National Tube (at least 48 reports), Columbia Steel (at least 23 reports), American Steel & Wire (at least 61 reports), Carnegie-Illinois (at least 222 reports), and Tennessee Coal & Iron (at least 35 reports).

27. In reviewing the National Tube "Form B" reports for 1943, the court found the possibility of some relationship between three reports, each of which appears to refer to a strike by crane operators at National Works in December, 1943. The "Final Report," dated January 1, 1943 (although the intended date was probably January 1, 1944), seems to contain a summary of the two other reports. Although the existence of some relationship between figures on the "Final Report" is no more than a possibility, the figures for production losses of ingots (10,000 tons) and blooms (8,236 tons) will be disregarded, while the figures for production losses of rounds and pipe (finished products) will be included. The court finds that the resulting figure for National Tube for 1943 is estimated production loss of 13,414 tons of steel products due to strikes. (Ex. 141, "Form B" reports for National Tube; Ex. 6, May 22, 1970, pp. 2–3)

28. In reviewing the Columbia Steel "Form B" reports for 1943, the court did not find figures which might appear to be related. The court finds that the figures for Columbia Steel for 1943 are estimated production losses of 1,772 tons of steel products and 1,158 tons of ingots due to strikes. (Ex. 141, "Form B" reports for Columbia Steel; Ex. 6, May 22, 1970, p. 4)

29. In reviewing the American Steel & Wire "Form B" reports for 1943, the court noticed the possibility of some overlapping of figures on a report from South Works dated November 16, 1943. Although a study of the detail does not convince me of any relationship, I have nevertheless disregarded the loss figures for ingots (1,450 tons) and billets (1,189 tons), while including the loss figures for rods, wire, spring and cable. The court finds that the resulting figures for American Steel & Wire for 1943 are estimated production losses of 79,810 tons of steel products and 3,100 tons of ingots due to strikes. (Ex. 141, "Form B" reports for American Steel & Wire; Ex. 6, May 22, 1970, pp. 5–6)

30. In reviewing the Carnegie-Illinois "Form B" reports for 1943, the court found that at least 15 "Form B" reports for 1942 for the Carnegie-Illinois Gary Steel facilities were placed by mistake in Exhibit 141, which contains the available "Form B" reports for 1943. I have ignored these reports, and apparently U. S. Steel's summary of 1943 reports does not include figures for these misplaced 1942 reports.

As to the possibility of relationship between production loss figures on the 1943 reports, I find only one report, dated November 18, 1943 for Irvin Works, which merits consideration. Since there is a possibility of duplication here on figures for losses of slabs (semifinished product) and then losses of plates and coils (finished product which may result from further processing of slab), I shall disregard the figure for slab (11,029 tons), while including the figures for plates and coils. (See, generally, Ex. 24) The court finds that the resulting figures for Carnegie-Illinois for 1943 are estimated production losses of 141,376 tons of steel products and 27,733 tons of ingots due to strikes. (Ex. 141, "Form B" reports for Carnegie-Illinois; Ex. 6, May 22, 1970, pp. 7–12)

31. In reviewing the Tennessee Coal & Iron "Form B" reports for 1943, the court found no production loss estimate figures which suggest more than the remotest possibility of any duplication. Therefore, I find that the figures for

16. See Findings of Fact #26–#38, #39, infra.

Tennessee Coal & Iron for 1943 are estimated production losses of 20,014 tons of steel products and 4,640 tons of ingots due to strikes. (Ex. 141, "Form B" reports for Tennessee Coal & Iron; Ex. 6, May 22, 1970, p. 13).

32. Exhibit 7, May 22, 1970, consists of a ten-page listing of the contents of the available "Form B" reports for the year 1945 and two appended detail pages. The U. S. Steel manufacturing subsidiaries for which "Form B" reports are included are American Steel & Wire (at least 26 reports), Columbia Steel (at least 14 reports), Carnegie-Illinois (at least 105 reports), National Tube (at least 52 reports), and Tennessee Coal & Iron (at least 16 reports).

33. In reviewing the American Steel & Wire "Form B" reports for 1945, I found there is at least some possibility of duplication on two reports, for Worcester Works-South, dated January 23, 1945, and for Donora, dated October 22, 1945. On the Worcester report, the court has disregarded figures under "process" (535 tons of ingots and 1,356 tons of steel products) and included only figures under "finished" products (725 tons). For the Donora report, the court observed at least the possibility of some duplication of figures; so the loss figures for ingots (11,300 tons) and billets (9,720 tons) have been disregarded, while the loss figures in tons for rods, wires, nails and other products have been included. The court finds that the resulting figure for American Steel & Wire for 1945 is estimated production loss of 27,871 tons of steel products due to strikes. (Ex. 138, "Form B" reports for American Steel & Wire; Ex. 7, May 22, 1970, p. 2)

34. In reviewing the Columbia Steel "Form B" reports for 1945, the court found all production loss estimates to be in terms of ingots only or in terms of steel products only. It appears that the losses were distinct and unrelated. The court finds that the figures for Columbia Steel for 1945 are estimated production losses of 507 tons of steel products and 133 tons of ingots due to strikes. (Ex.

138, "Form B" reports for Columbia Steel; Ex. 7, May 22, 1970, p. 3)

35. In reviewing the Carnegie-Illinois "Form B" reports for 1945, the court observed several instances of "Form B" report figures which may involve some duplication. The report for Gary Steel Works, dated March 9, 1945, includes a loss for coke as well as losses for ingots and steel products. The coke loss figure was reported by plaintiff in its Exhibit 7, May 22, 1970, p. 4; but the court has disregarded this figure (31,000 tons), because coke production is an intermediate step in ultimate production of ingots and steel products. (See Finding of Fact #8) The report for Clairton Works, dated June 21, 1945, contains loss figures for ingots, semifinished products (slabs, blooms, billets) and finished products (bars, standard structural shapes). Although the possibility of duplication here is perhaps questionable, I have nevertheless excluded the loss figures for ingots (9,320 tons) and semifinished products (6,500 tons), while included the finished product figures for bars and standard structural shapes (8,990 tons).

The report for South Works, dated July 14, 1945, includes loss figures for various categories. The court has disregarded all loss figures on this report for two reasons: (1) There is some possibility of duplication; and (2) plaintiff's summarization of this report's figures on Exhibit 7, May 22, 1970, p. 6, cannot be reconciled readily with the figures on the "Form B" report itself. The report for Duquesne Works, dated July 2, 1945, contains loss figures for ingots, semifinished products and finished products. Since there may be some relationship between the ingot loss and semifinished product loss figures, I have disregarded the ingot loss figures (6,223 tons), but have included the apparently distinct figures for semifinished products (3,332 tons) and finished products (5,738 tons). The report for Edgar Thomson Works, dated August 6, 1945, may contain ingot loss figures bearing some relationship to semifinished product loss figures. Accordingly, the ingot

loss figures (13,953 tons) have been excluded. The report for Duquesne Works, dated November 30, 1945, includes ingot loss figures which may be related to semifinished product loss figures; the ingot loss figures (64,210 tons) have thus been eliminated from further consideration.

Exhibit 137, the list of "Form B" reports for 1945, refers to a "Form B" report dealing with production losses from a strike or strikes in April, 1945. U. S. Steel notes that the original "Form B" report is unavailable, but has substituted detailed figures from a contemporaneous administrative report. The total of the figures broken down on the substitute report is equal to the total figure which was apparently transposed onto Exhibit 137 from the original "Form B" report, now unavailable. From the indicated total of 208,046 tons, the court has included the ingot loss figure of 83,327 tons and excluded the iron loss figure of 124,719 tons. (See analysis after Finding of Fact #13; Plaintiff's second letter to the court, May 21, 1970)

I find that the resulting figures for Carnegie-Illinois for 1945 are estimated production losses of 380,116 tons of steel products and 171,480 tons of ingots due to strikes. (Ex. 138, "Form B" reports for Carnegie-Illinois; Ex. 7, May 22, 1970, pp. 1, 4–7)

36. In reviewing the National Tube "Form B" reports for 1945, the court noticed two reports with possible duplication or confusing figures. The report for National Works, dated October 29, 1945, contains some loss figures which may overlap. I have therefore disregarded the loss figures for ingots (10,967 tons) and blooms (8,102 tons), while considering the loss figures for rounds. The report for Lorain Works, dated January 22, 1946 (although it reported effects of a work stoppage of November 23, 1945), includes loss figures for brass castings, iron castings and ingot castings. These figures have been excluded because it is not clear to what extent the losses should be considered as ingots or

as finished steel products. The court finds that the resulting figure for National Tube for 1945 is estimated production loss of 24,134 tons of steel products due to strikes. (Ex. 138, "Form B" reports for National Tube; Ex. 7, May 22, 1970, pp. 8–9)

37. In reviewing the Tennessee Coal & Iron "Form B" reports for 1945, the court detected some possibility of duplication on three reports. The undated summary report for a strike during April, 1945 contains loss figures for various categories, such as ingots, semifinished products and finished products. Plaintiff's witness Ganem suggested that the report indicated a loss of about 40,000 tons of finished products, after consideration of possible duplication in figures. (3635–3637; Findings of Fact #23–#25 and analysis after Findings of Fact #24 and #25) After analyzing the report, I have decided to be even more cautious by including only the loss figures for 29,944 tons of finished products (rail, plates and structural shapes). All other loss figures on the report have been disregarded. The report for Ensley Works, dated June 24, 1945, includes loss figures for various categories. Since there may be a fair possibility of some relationship between some of the loss figures, the court has excluded from further consideration all loss figures except for rails (finished product: 16,700 tons).

The report for Fairfield Steel Works, dated June 27, 1945 (with attached details on sheet dated July 2, 1945), contains loss figures for ingots, semifinished products and finished products. In an exercise of caution, I shall disregard the loss figure for ingots (42,600 tons), and consider only the semifinished and finished product loss figures. The court finds that the resulting figure for Tennessee Coal & Iron for 1945 is estimated production loss of 357,124 tons of steel products due to strikes. (Ex. 138, "Form B" reports for Tennessee Coal & Iron; Ex. 7, May 22, 1970, p. 10 and page appended thereto)

38. A recapitulation of the figures for 1943 and 1945 derived from the court's analysis in Findings of Fact #26–#37 is as follows:

ADJUSTED PRODUCTION LOSS FIGURES FOR INGOTS
AND STEEL PRODUCTS: 1943 and 1945

### 1943

| | Specified Ingot Losses—Production (tons) | Specified Steel Product Losses— Production (tons) |
|---|---|---|
| National Tube | –0– | 13,414 |
| Columbia Steel | 1,158 | 1,772 |
| American Steel & Wire | 3,100 | 79,810 |
| Carnegie-Illinois | 27,733 | 141,376 |
| Tennessee Coal & Iron | 4,640 | 20,014 |
| Totals | 36,631 | 256,386 |

### 1945

| | Specified Ingot Losses—Production (tons) | Specified Steel Product Losses— Production (tons) |
|---|---|---|
| National Tube | –0– | 24,134 |
| Columbia Steel | 133 | 507 |
| American Steel & Wire | –0– | 27,871 |
| Carnegie-Illinois | 171,480 | 380,116 |
| Tennessee Coal & Iron | –0– | 357,124 |
| Totals | 171,613 | 789,752 |

39. The court finds that the figures in Finding of Fact #38 are a reasonable approximation of production losses of ingots and steel products during the years 1943 and 1945, based on the contemporaneous estimates contained on the available "Form B" reports for those years. All of the more than six hundred individual "Form B" reports included in Exhibit 138 (for the year 1945) and Exhibit 141 (for the year 1943) were studied in my chambers, and loss figures were excluded from further consideration when even a fair possibility of some duplication or overlapping was presented.

40. The production loss figures for the years 1941, 1942, 1944 (from Finding of Fact #23) and for the years 1943 and 1945 (from Finding of Fact #38) may be summarized as follows:

PRODUCTION LOSSES DUE TO STRIKES: 1941–
1945 [17] (broken down into three types of categories: (1) specified ingot losses; (2) specified steel product losses; and (3) combined totals which apparently include iron, ingots and steel products)

17. The production loss figures for 1941–1945 in Finding of Fact #40 are included as part of the production loss estimate totals reported to stockholders after the end of each year in U. S. Steel's annual reports during the period from 1941 to 1945. (Findings of Fact #18, column (d); #19, column (d); 121, 125, 128) The production loss figures for 1942–1945 reported in Finding of Fact #40 are in-

**1941**

Specified ingot losses—production ........................18,715 tons

Combined total of production losses of

iron, ingots and steel products—no
breakdown by loss category ........................approx. 281,000

(Finding of Fact #23)

**1942**

Specified ingot losses—production ...........................9,441

Combined total of production losses of
iron, ingots and steel products—no
breakdown by loss category ........................approx. 43,500

(Finding of Fact #23)

**1943**

Specified ingot losses—production .........................36,631

Specified steel product losses—production .................256,386

(Finding of Fact #38;
Findings of Fact #23,
#26, #27–#31)

**1944**

Specified ingot losses—production ........................118,721

Specified steel product losses—production .................294,128

Combined total of production losses of iron,
ingots and steel products—no breakdown by
loss category ....................................approx. 235,000

(Finding of Fact #23)

**1945**

Specified ingot losses—production ........................171,613

Specified steel product losses—production .................789,752

(Finding of Fact #38;
Findings of Fact #23,
#32, #33–#37)

———◆———

cluded as well as part of the summary prepared by U. S. Steel's Cost and Statistics Division, dated March 5, 1947 ("Work Stoppages * * * Strikes or Slowdowns Causing Loss of Production * * * Estimated Tonnage Lost * * Steel") (Findings of Fact #18, column (c); #19, column (c); Ex. 128, p. 2) In light of management's attention to 1941–1945 production loss figures—at the end of each of the years involved and, indeed, in 1947—the court must doubt seriously the validity of any suggestion by plaintiff's counsel that reported production losses during the years 1941–1945 did not affect net shipments of steel products in those years. See comments by counsel for both sides (3639–3646) and the court's subsequent evidentiary analysis of reported production loss figures for 1941–1945. (Findings of Fact #18–#39, #41–#47).

41. The average yield of net shipments of steel products from total shipments of steel products for the years 1941–1945 was as follows:

AVERAGE YIELD: NET SHIPMENTS OF STEEL
PRODUCTS FROM TOTAL SHIPMENTS
OF STEEL PRODUCTS, 1941–1945

| | |
|---|---|
| 1941 | 91.6% |
| 1942 | 88.9% |
| 1943 | 86.6% |
| 1944 | 89.1% |
| 1945 | 89.8% |

(Ex. 8, May 22, 1970, p. 2; 3624, 3627)

As stated, the parties agree that the appropriate loss indicator "for the purposes of this action" is net shipments. (Finding of Fact #13) In the steel-making industry, production and total shipments are generally correlative. The court has therefore determined that a loss of production of steel products would have been comparable generally to a potential loss of total shipments of steel products. (Finding of Fact #13)

42. The average yield of net shipments of steel products from ingot production for the years 1941–1945 was as indicated:

AVERAGE YIELD: NET SHIPMENTS OF STEEL
PRODUCTS FROM INGOT PRODUCTION,
1941–1945

| | |
|---|---|
| 1941 | 71.9% |
| 1942 | 69.4% |
| 1943 | 66.5% |
| 1944 | 69.0% |
| 1945 | 69.6% |

(Ex. 8, May 22, 1970, p. 1; 3626)

*Introduction to Finding of Fact #43*

Based on the specified production loss figures for ingots and steel products for the years 1941–1945 (Finding of Fact #40) and the additional figures representing combined totals for production losses of iron, ingots and steel products for the years 1941, 1942 and 1944 (Finding of Fact #40), the court has formulated potential loss figures in terms of *net shipments of steel products* from the loss figures stated in terms of *production.*

(1) To the extent that specified ingot production loss figures could be derived in Findings of Fact #23, #38 and then #40, the specified ingot production loss figures for a given year will be converted into potential loss figures for net shipments of steel products. (Finding of Fact #42)

(2) To the extent that specified production loss figures for steel products could be derived in Findings of Fact #23, #38 and then #40, the specified production loss figures for steel products for a given year will be converted into potential loss figures for net shipments of steel products. (Finding of Fact #41 and subsequent analysis)

(3) To the extent that production loss figures could be categorized only in terms of a combined loss total including iron, ingots and steel products, the court will determine the range of possibility for production losses of steel products. In other words, the combined total (which has not been broken down by category) conceivably might indicate a production loss of all iron, at one extreme, or a production loss of all steel products, at the other. (See analysis after Finding of Fact #13) The minimum and maximum potential loss figures for net shipments of steel products will be set forth. (See (2) above)

43. With consideration of the production loss figures in Finding of Fact #40 and the above explanatory material, the court presents a reasonable approximation of U. S. Steel's potential losses in net shipments of steel products due to strikes in the years 1941 to 1945:

FINDING OF FACT #43—1941

**1941**

Specified Ingot Losses—
Production (tons)
(Finding of Fact #40;
Introduction (1).)

18,715

×

Average Yield:
Net Shipments of Steel
Products from Ingot
Production
(Finding of Fact #42)

71.9 %

=

Reasonable Approximation
of Potential Losses in Net
Shipments of Steel Products
Due to Strikes (tons)—
Minimum for year=(A)+(B)
Maximum for year=(A)+(C)

(A)

13,456

Combined total of
Production Losses of
Iron, Ingots and Steel
Products (tons)
(Finding of Fact #40;
Introduction (3).)

281,000

Production of
Steel Products—
Range: 0 –281,000

Production of
Steel Products:
Maximum

281,000

×

Average Yield:
Net Shipments of
Steel Products
from Total
Shipments
(Finding of Fact #41)

91.6 %

=

(B)

-0-

Min.

(C)

257,396

Max.

Total for 1941:Range of potential losses in
net shipments of steel products due to strikes;
minimum to maximum (tons)

(A)+(B)

13,456

TO

(A)+(C)

270,852

[A23303]

FINDING OF FACT #43—1942

Specified Ingot Losses—
Production (tons)
(Finding of Fact #40;
Introduction (1) )

Average Yield:
Net Shipments of Steel
Products from Ingot
Production
(Finding of Fact #42)

Reasonable Approximation
of Potential Losses in Net
Shipments of Steel Products
Due to Strikes (tons)—
Minimum for year=(A)+(B)
Maximum for year=(1)+(C)

1942

9,441     ×     69.4 %     =     6,552     (A)

Combined total of
Production Losses of
Iron,Ingots and Steel
Products (tons)
(Finding of Fact #40;
Introduction (3) )

Production of
Steel Products—
Range:0 - 43,500

43,500

-0-     (B)
Min.

Production of
Steel Products:
Maximum

Average Yield:
Net Shipments of
Steel Products
from Total
Shipments
(Finding of Fact #41)

43,500     ×     88.9 %     =     36,671     (C)
Max.

Total for 1942:Range of potential losses in
net shipments of steel products due to strikes;
minimum to maximum (tons)

(A)+(B)          (A)+(C)

6,552     TO     45,223

[A23291]

## FINDING OF FACT #43--1944

1944

Specified Ingot Losses--
Production (tons)
(Finding of Fact #40;
Introduction (1))

118,721

×

Average Yield:
Net Shipments of Steel
Products from Ingot
Production
(Finding of Fact #42)

69.0 %

=

Reasonable Approximation
of Potential Losses in Net
Shipments of Steel Products
Due to Strikes (tons)--
Minimum for Year=(A)+(B)+(G)
Maximum for Year=(A)+(B)+(D)

(A)

81,917

Specified Steel Product
Losses--Production (tons)
(Finding of Fact #40;
Introduction (2) )

294,128

×

Average Yield:
Net Shipments of Steel
Products from Total
Shipments
(Finding of Fact #41)

89.1 %

=

(B)

262,068

(Continued on next page)

LA23273

## FINDING OF FACT #43--1944 (Continued)

Reasonable Approximation
of Potential Losses in Net
Shipments of Steel Products
Due to Strikes (tons)--
Minimum for year=(A)+(B)+(C)
Maximum for year=(A)+(B)+(D)

Combined total of
Production Losses of
Iron, Ingots and Steel
Products (tons)
(Finding of Fact #40;
Introduction (3) )

Production of
Steel Products--
Range:0 - 235,000

235,000

Production of
Steel Products:
Maximum

235,000

Average Yield:
Net Shipments of
Steel Products
from Total
Shipments
(Finding of Fact#41)

89.1 %

(C)

-0-

Min.

(D)

209,385

Max.

═══

Total for 1944:Range of potential losses in
net shipments of steel products due to strikes,
minimum to maximum (tons)

(A)+(B)+(C)

343,985

TO

(A)+(B)+(D)

553,370

[A2334]

**FINDING OF FACT #43--1945**

**1945**

| Specified Ingot Losses-- Production (tons) (Finding of Fact #40; Introduction (1) ) | × | Average Yield: Net Shipments of Steel Products from Ingot Production (Finding of Fact #42) | = | Reasonable Approximation of Potential Losses in Net Shipments of Steel Products Due to Strikes (tons)-- Total for year=(A)+(B) (A) |
|---|---|---|---|---|
| 171,613 | | 69.6 % | | 119,442 |

| Specified Steel Product Losses--Production (tons) (Finding of Fact #40; Introduction (2) ) | × | Average Yield: Net Shipments of Steel Products from Total Shipments (Finding of Fact #41) | = | (B) |
|---|---|---|---|---|
| 789,752 | | 89.8 % | | 709,197 |

Total for 1945:Potential losses in net shipments of steel products due to strikes (tons)

(A) + (B)

828,639

LA2326?

44. The potential loss figures in net shipments of steel products due to strikes in the years 1941 to 1945 are summarized herewith:

REASONABLE APPROXIMATION OF POTENTIAL TONNAGE
LOSS IN NET SHIPMENTS OF STEEL PRODUCTS DUE
TO STRIKES: 1941–1945 [18]

| 1941 | 13,456 (Min.) | – 270,852 (Max.) | (range) | (Finding of Fact #43—for 1941) |
|------|------|------|------|------|
| 1942 | 6,552 (Min.) | – 45,223 (Max.) | (range) | (Finding of Fact #43—for 1942) |
| 1943 | | 246,389 | | (Finding of Fact #43—for 1943) |
| 1944 | 343,985 (Min.) | – 553,370 (Max.) | (range) | (Finding of Fact #43—for 1944) |
| 1945 | | 828,639 | | (Finding of Fact #43—for 1945) |

After obtaining a reasonable approximation of production losses of ingots and steel products due to strikes in 1941–1945 (Finding of Fact #40) and projecting the production loss figures into potential loss figures for net shipments of steel products (Findings of Fact #41–#44), the court considers the demand for steel products in the years 1941 through 1945.

45. The demand for steel in 1941 was strong throughout the year as evidenced by the fact that the steel industry's operating rate for the entire year was maintained above 90%, and average 97.3% rated capacity. By the end of 1941, the demand for steel equaled that which prevailed during 1942, 1943 and 1944. For the years 1942, 1943 and 1944 the demand for steel was high, and plaintiff could have sold all the steel which it could have shipped. The high level of demand continued into the first quarter of 1945, after which the reduction in requirements for the armed forces caused cancellations of orders and decreases in production rates. This trend continued until the end of the war, after which the civilian demands again increased production in 1945, but not to the level that existed during the war. Plaintiff's overall operating rate for 1945 was 82%. U. S. Steel's net shipments in tons of steel products for the years 1941–1945 were 20,770,892 (for 1941), 20,803,693 (for 1942), 20,251,717 (for 1943), 21,-221,622 (for 1944) and 18,393,980 (for 1945). (Stipulation, May 21, 1970; Ex. 8, May 22, 1970, p. 1; see also Ex. 216)

46. In view of the high demand for steel products in 1942, 1943 and 1944 and the general correlation between production and shipments, the court finds by a fair preponderance of the credible evidence that almost all indicated production losses for those years (Finding of Fact #40) would have been converted into related losses for each year of net shipments of steel products. (Findings of Fact #43, #44) In view of the generally strong demand for steel products in 1941 and 1945 and the general correlation between production and shipments, the court finds by a fair preponderance of the credible evidence that the major part of the indicated production losses for those years (Finding of Fact #40) would have been converted into related

18. U. S. Steel maintains that two strikes in 1948 were "unusual" events under § 442 because they allegedly resulted in a loss of net shipments of steel products of 413,345 tons. (See analysis of plaintiff's 1948 claim of lost shipments due to strikes after Findings of Fact #15 and #16)

losses for each year of net shipments of steel products (i. e., well over half of the potential tonnage losses set forth in Findings of Fact #43, #44 actually would have resulted).

■ 47. On the basis of the foregoing Findings of Fact and the record presented, the court concludes that plaintiff has failed to prove by a fair preponderance of the credible evidence that the two 1948 strikes were "unusual" events within the meaning of § 442(a) (1).

## THE 1948 EXPLOSION

48. On July 3, 1948, an explosion occurred in the "No. 1-4 & E Blast Furnace Blowing Engine House" at U. S. Steel's South Works in Chicago, Illinois. (Stipulation, 176–177)

49. This explosion caused extensive damage to the building and its roof, the air mains and the blowing engines and valves servicing Blast Furnaces 1-4 & E. (Ex. 30)

50. The explosion at South Works was an "unusual" event within the meaning of § 442(a) (1). (Stipulation, Pretrial Order No. 2, p. 6)

---

Plaintiff alleges that, as a result of lost shipments and increased costs attributable to the 1948 explosion, its 1948 income before federal income taxes was reduced $2,767,000 below what it otherwise would have been. (Plaintiff's Amended Proposed Finding of Fact No. 11, received by the court May 12, 1970; Plaintiff's letter to the court, May 11, 1970, pp. 1–2; Amended Ex. 191–A, received by the court May 12, 1970; Plaintiff's letter to the court, May 18, 1970, p. 1; Ex. 191–B, received by the court May 18, 1970)

51. U. S. Steel's 1948 income before federal income taxes was $300,471,410.-17. (Stipulation, 1875)

52. Assuming arguendo that plaintiff's $2,767,000 figure is appropriate,

U. S. Steel's 1948 income before federal income taxes was reduced (as a result of the 1948 explosion) 0.91% below what such income otherwise would have been. The 1948 explosion is the only "unusual" occurrence within the meaning of § 442 which plaintiff has established for 1948.

■ 53. Plaintiff has failed to prove by a fair preponderance of the credible evidence that its normal production, output or operation was interrupted or diminished to a legally significant extent in 1948 as a result of the South Works explosion, the only "unusual" occurrence within the meaning of § 442 which U. S. Steel has established for 1948. Reg. 130 (1939 Code), § 40.442–2(a) (2); Oxford Paper Company v. Commissioner of Internal Revenue, 302 F.2d 674 (2d Cir.1962) supra.

54. Plaintiff has failed to prove by a fair preponderance of the credible evidence that it is entitled to application of § 442 for the year 1948.

## THE 1949 STRIKE

55. On October 1, 1949, the United Steel Workers commenced a strike which shut down plaintiff's steel-making facilities. The strike terminated on or about November 11, 1949. (Stipulation, 177)

56. The strike during October–November, 1949 was an "unusual" event within the meaning of § 442(a) (1). (Stipulation, Pretrial Order No. 2, p. 6)

57. U. S. Steel made no shipments of steel products during the strike period. (Ex. 16; 1539–1540, 1552)

58. Plaintiff's *billed* shipments of steel products in 1949 were 18,212,102 tons (Ex. 16), while its *net* shipments of steel products in 1949 were 18,164,564 tons. (Ex. 8, May 22, 1970, p. 1) The court finds on the basis of these totals that the terms "billed shipments" and "net shipments," in the context of plaintiff's 1949 operations, may be treated as synonymous. (See, generally, 1663–1664)

59. During the year 1949, the actual monthly billed shipments by U. S. Steel subsidiaries were as indicated in the following table:

### ACTUAL MONTHLY BILLED SHIPMENTS BY U. S. STEEL SUBSIDIARIES FOR 1949 (TONS)

| Month | Billed Shipments |
|---|---|
| January | 1,800,971 |
| February | 1,729,796 |
| March | 1,960,449 |
| April | 1,800,401 |
| May | 1,763,533 |
| June | 1,712,716 |
| July | 1,410,365 |
| August | 1,615,898 |
| September | 1,755,764 |
| October }<br>November } | 912,733 |
| December | 1,749,476 |
| Total: 1949 | 18,212,102 |

(Ex. 16)

———◆———

60. Demand for steel products was in excess of supply during the first quarter of 1949. A mild recession began to occur about April and continued through July. This recession bottomed out in July. Demand began to increase again in August and was good in September. (1550–1552, 3048; Ex. 216)

61. The court finds by a fair preponderance of the credible evidence that, as a result of the strike by the United Steel Workers from October 1, 1949 to about November 11, 1949, U. S. Steel's net shipments of steel products for the year 1949 were at least 1,700,000 tons below what such shipments otherwise would have been. (1541–1542, 2761, 3009; Exs. 16, 121, 216 [19])

62. For the year 1949, U. S. Steel's average income (before federal income taxes) for each ton of actual net shipments of steel products was at least $10.83.[20] (Stipulation with annexed

19. Plaintiff's production loss estimate figure for the strike, stated only in terms of ingots, was 3,722,316 tons. (See Ex. 133 (the available "Form B" reports for the year 1949); Ex. 124, p. 2 (summary of ingot production loss estimates, in Ex. 133); and Ex. 128, p. 9 (summary of "Estimated Production Losses—Net tons * * * General Steel Strike")) When the above ingot production loss figure (3,722,316 tons) is multiplied by 70.5% (the 1949 average yield of tons of net shipments of steel products from tons of ingot production), the result is a potential loss of 2,624,233 tons of net shipments of steel products due to the strike. (See Ex. 8, May 22, 1970, p. 1; Introduction (1) to Finding of Fact # 43)

In making Finding of Fact # 61, the court has considered the record presented on such matters as the possibility of anticipatory buying by customers before the strike and the possibility of "make-up" of lost shipments in the period after the strike but before the end of 1949. The parties agree that any "make-up" after December 31, 1949 would be irrelevant for purposes of this action. (1674–1675)

20. The $10.83 figure results from dividing $200,741,056 (U. S. Steel's 1949 consolidated contract book profit from manufacturing activities before income taxes) by 18,535,925 (U. S. Steel's 1949 tonnage of "net steel shipments," according to the stipulated figures submitted June 26,

schedule, June 26, 1970; Court's Ex. 9) The court finds that the 1949 average ($10.83) is a reasonable figure to use in computation, although monthly averages and averages for different products during 1949 may have varied.

63. U. S. Steel's 1949 income before federal income taxes was reduced (as a result of the 1949 strike) at least $18,411,000 below what such income otherwise would have been.

64. U. S. Steel's 1949 income before federal income taxes was $301,290,246.95. (Stipulation, 1875)

65. Therefore, plaintiff's 1949 income before federal income taxes was reduced (as a result of the 1949 strike) at least 5.76% below what such income otherwise would have been.

■ 66. U. S. Steel has proved by a fair preponderance of the credible evidence that its normal production, output or operation was interrupted or diminished to a legally significant extent in 1949 as a result of the 1949 strike by the United Steel Workers, an "unusual" occurrence within the meaning of § 442. Reg. 130 (1939 Code), § 40.442–2(a) (2); Oxford Paper Company v. Commissioner of Internal Revenue, supra.

67. Plaintiff has proved by a fair preponderance of the credible evidence that it is entitled to application of § 442(c) for the year 1949.

## II. PLAINTIFF'S CLAIM UNDER SECTION 433(b) (9)

Having determined that U. S. Steel is entitled to application of § 442 for the year 1949 but not for the year 1948, the court considers plaintiff's alternative claim under 26 U.S.C. Excess Profits Taxes § 433(b) (9) for disallowance of

certain deductions for expenses incurred in the year 1949. (Stipulation, May 26, 1970) Plaintiff characterizes the deductions in question as "strike expenses." for the reasons stated below, plaintiff has failed to establish that it is entitled to application of § 433(b) (9) for the year 1949.

## RELEVANT STATUTE AND REGULATION

26 U.S.C. Excess Profits Taxes § 433 (b) (9) reads in pertinent part:

"(b) *Taxable years in base period.* For the purposes of computing the average base period net income, the excess profits net income for any taxable year shall be the normal-tax net income * * * for such taxable year, increased * * * by the following adjustments * * *:

\* \* \* \* \* \*

"(9) *Judgments, intangible drilling and development costs, casualty losses, and other abnormal deductions.* If, for any taxable year * * * within * * * the base period, any class of deductions for the taxable year exceeded 115 per centum of the average amount of deductions of such class for the four previous taxable years * * *, the deductions of such class shall * * * be disallowed in an amount equal to such excess. For the purposes of this paragraph, each of the following groups of deductions shall constitute a class of deductions:

"(A) Deductions attributable to claims, awards, judgments, and decrees against the taxpayer, and interest on the foregoing;

"(B) Deductions attributable to intangible drilling and development

1970). The court notes that plaintiff's Exhibit 8, May 22, 1970, p. 1 records 1949 net shipments of steel products as 18,164,564 tons; that plaintiff's Exhibit 16 includes 1949 monthly figures for "billed shipments" of "steel products" which total 18,212,102 tons; and that the schedule annexed to the stipulation of June 26, 1970 records 1949 "net steel shipments" of 18,535,925 tons. I have

utilized the 18,535,925 ton figure since the parties agree that the totals for 1949 in the schedule were audited and certified by independent accountants. (Joint letter to the court, June 26, 1970) However, the court's determination would be the same even if one of the other figures (i. e., 18,164,564 tons or 18,212,102 tons) were to be used.

costs paid or incurred in or for the drilling of wells or the preparation of wells for the production of oil or gas, and for development costs in the case of mines; and

"(C) Deductions under section 23(f) for losses arising from fires, storms, shipwreck, or other casualty, or from theft, or arising from the demolition, abandonment, or loss of useful value of property, not compensated for by insurance or otherwise. * * *

"The classification of deductions of any class not described in subparagraphs (A) to (C), inclusive, shall be subject to regulations prescribed by the Secretary."

The applicable regulation (Reg. 130, § 40.433(b)–3(d)(2)) reads:

"(2) Deductions which do not fall within any of the classes specified in section 433(b)(9)(A)–(C) may be grouped by the taxpayer, subject to approval by the Commissioner on the examination of the taxpayer's return, *in such other classes as are reasonable in a business of the type which the taxpayer conducts and are applicable in the light of the taxpayer's business experience and accounting practice.* Such a classification will be applicable to all other taxable years considered at any time in adjusting deductions under this section." (Emphasis added)

After hearing the testimony of the parties and examining the pleadings, the exhibits and the proposed findings of fact and conclusions of law, this court makes the following findings of fact regarding plaintiff's contention that it is entitled to application of § 433(b)(9) for the year 1949:

## FINDINGS OF FACT

68. All expenses "in relation to strikes and work stoppages" in each of the years 1945 to 1949, inclusive, were claimed as deductions by U. S. Steel in its consolidated federal income tax returns for those years and upon audit were allowed by the Internal Revenue Service. In those returns, no deductions were specifically identified as "strike expenses." (Stipulation, June 24, 1970; Court's Ex. 8)

69. U. S. Steel's claim for refund of federal income and excess profits tax paid for 1950 and refund of assessed interest paid on assessments of additional tax for 1950 included a statement alleging that plaintiff qualified for application of § 433(b)(9) for the year 1949. Plaintiff's refund claim was rejected by the Internal Revenue Service. (See Findings of Fact #5, #6, supra)

70. On January 21, 1946 the United Steel Workers commenced a strike which completely stopped all production and shipments at plaintiff's steel-making facilities. The strike terminated on or about February 21, 1946. (Stipulation, 177; Joint Proposed Finding of Fact No. 74, June 24, 1970)

71. In a letter to the chief accounting officers of plaintiff's subsidiaries, dated February 22, 1946, George W. Rooney, U. S. Steel's Vice President-Comptroller, advised the chief accounting officers about "accounting considerations arising out of strike." Under the heading "Recommended Definition and Accounting Disposition of Strike Expense," Rooney stated that "[i]t has been recommended that strike expense comprehend all ascertainable costs and expenses incurred (1) in preparing for the shutdown, (2) during the period of the strike, and (3) in preparing for the resumption of operations." (Ex. 122, pp. 5, 7)

72. Exhibit 244, which includes a total expense figure of $30,375,768, contains figures for each U. S. Steel subsidiary with respect to expenses incurred during the period of the 1946 strike, together with some strike-related expenses incurred immediately before and after the strike. (Ex. 244; 3553–3554, 3578–3579; Joint Proposed Finding of Fact No. 75, June 24, 1970)

73. During the years 1945, 1947 and 1948,[21] there were no strikes against U. S. Steel which completely stopped all production and shipments at plaintiff's steel-making facilities. (Stipulation, 3578–3579; Joint Proposed Finding of Fact No. 77, June 24, 1970)

74. On October 1, 1949, the United Steel Workers commenced a strike which completely stopped all production and shipments at plaintiff's steel-making facilities. The strike terminated on or about November 11, 1949. (Findings of Fact #55, #57, supra; Joint Proposed Finding of Fact No. 72)

75. In a telegram to the chief accounting officers of plaintiff's subsidiaries, dated October 3, 1949, Rowland B. Scott, U. S. Steel's general accountant, reported to the chief accounting officers that "it will be necessary to compile a statistical record of strike expense using Mr. Rooney's letter of Feb. 22, 1946 as pattern." (1721–1723, 1848; Ex. 122, pp. 2–4)

76. Exhibit 122, p. 16, which includes a total expense figure of $52,975,809, contains figures for each U. S. Steel subsidiary with respect to expenses incurred during the period of the 1949 strike, together with some strike-related expenses incurred immediately before and after the strike. (Ex. 122, p. 16; Joint Proposed Finding of Fact No. 73, June 24, 1970)

77. All except a relatively small part of the $52,975,809 in expenses set forth in Exhibit 122, p. 16, would have been incurred by plaintiff regardless of whether or not the October-November 1949 strike by the United Steel Workers had taken place. (Exs. 122, BK; 1770–1786, 1839–1848, 1859–1864, 1871–1872; Joint Proposed Finding of Fact No. 81, June 24, 1970)

78. In connection with the 1946 and 1949 strikes mentioned above (Findings of Fact #70, #74), U. S. Steel, "for its own purposes," kept records of ascertainable costs and expenses incurred (1) in preparing for the shut-down, (2) during the period of the strike, and (3) in preparing for the resumption of operations. (Stipulation, June 24, 1970; Findings of Fact #71, #75; Ex. 244; Ex. 122, p. 16)

79. The primary reason stated by plaintiff for recording the expense figures in Exhibit 122, p. 16, under the heading " * * * Analysis of Steel Strike Expense For The Period October 1, [1949] to November 11, 1949 Inclusive," was to show "the amount of dollars that it cost to run the company during the strike." (1871)[22]

80. On the record presented, the court finds that all except a relatively small part of the alleged "strike expenses" reported by U. S. Steel in Exhibits 244 and 122, p. 16, would have been incurred by plaintiff whether or not strikes had taken place during the periods involved. Plaintiff has failed to specify which expenses were incurred *only* because of the strikes' occurrence, but it has acknowledged that all except a relatively small part of the expenses set forth on Exhibit 122, p. 16 would have been incurred

---

21. § 433(b) (9) provides that an established "class of deductions" for a base period year be compared with deductions in the same class for the four previous taxable years. Plaintiff has proposed that its alleged "strike expenses" in 1949 be compared with its alleged "strike expenses" for the period 1945–1948.

22. Plaintiff's witness Scott conceded that the exhibit was primarily a cash-flow document; that what management really wanted to know was the cash cost of operating the business "while the union was on strike;" that "these were cash expenses during the period;" and that a substantial part of the cash expenses would have been incurred regardless of whether or not there had been a strike. (1871)
The $52,975,809 total expense figure on Exhibit 122, p. 16, includes $47,703,081 for "total cash costs" and $5,272,728 for "depreciation." The $30,375,768 total expense figure on Exhibit 244 includes $25,870,644 for "total cash costs," $4,539,607 for "depreciation," and a minus figure of $34,483 for "expense incurred prior to 1/1/46."

whether or not the 1949 strike had taken place. (See Finding of Fact #77)

81. U. S. Steel failed to provide records indicating whether it was required by contract or otherwise to pay any employees in 1946 or 1949 irrespective of availability to perform services during the strike periods. However, plaintiff's "1949 Strike Policy" statement included the following provisions:

(a) Management salaried employees "shall be paid their regular base salaries so long as they stand ready and willing to work at management's direction."

(b) Hourly rated management, confidential and technical employees not represented by the striking union "will be paid for not less than 40 hours per week at their base hourly rate, provided they remain ready and willing to work at management's direction."

(c) Non-management salaried employees not included in the bargaining unit represented by the striking union "shall be paid their regular base salary so long as they stand ready and willing to work at management's direction." (Ex. BK, pp. 2, 3; Ex. 122, pp. 21, 23–25; 1861)

82. During the period of the 1949 strike, U. S. Steel's district sales offices were open. (1741–1742) During strikes such as the ones in 1946 and 1949, salesmen continued to call on customers. (Ex. BK, p. 3) Salaries and wages paid to salesmen during the strike period were included by plaintiff as "strike expense" in Exhibit 122, p. 16. (1740; Ex. 122, p. 16)

83. Plaintiff included $4,546,066 of "Ad Valorem Taxes" as 1949 "strike expense" and $1,068,422 of "Ad Valorem Taxes" as 1946 "strike expense." (Ex. 122, p. 16; Ex. 244) The 1949 amount was calculated by considering "the pro rata amount of tax accrual multiplied by the number of strike days." (Ex. BK,

p. 6) U. S. Steel would have been required to pay these taxes during 1949 regardless of its rate of operations. (1862)

84. Plaintiff included $5,272,728 of "Depreciation" as 1949 "strike expense" and approximately $4,539,607[23] of "Depreciation" as 1946 "strike expense." (Ex. 122, p. 16; Ex. 244) The figures are based on U. S. Steel's own calculations of accrued depreciation "applicable to the strike period." (Ex. 122, pp. 7, 15)

85. Dues to the American Iron & Steel Institute and contributions to charity were probably included by plaintiff as 1949 "strike expense" under the category of "Selling, General and Administrative Expense." It was plaintiff's policy to consider such payments as "strike expense" if the payments were made during the period of the 1949 strike, regardless of whether or not the timing of the payments had anything to do with the strike. (1843–1848)

86. Plaintiff has failed to prove by a fair preponderance of the credible evidence that many of the expense items denominated as "strike expense" in Exhibit 244 (for the strike in 1946) and Exhibit 122, p. 16 (for the strike in 1949) served an objective or purpose substantially different from expense items of a comparable nature incurred during periods when production and shipments at plaintiff's steel-making facilities were *not* completely stopped as a result of a strike. (See, e. g., Findings of Fact #81–#85; see, generally, Findings of Fact #70, #74)

87. Plaintiff has failed to prove by a fair preponderance of the credible evidence that classification of its alleged "strike expense" in a separate class of deductions as reported on Exhibits 244 and 122, p. 16 (totaling $30,375,768 for 1946 and $52,875,809 for 1949) is "reasonable in a business of the type * * *

23. The total figure of $30,375,768 reported on Exhibit 244 as "strike expense" for 1946 includes a figure of $30,410,251 ($25,870,644 in "total cash costs" and $4,539,607 in "depreciation") offset by a figure of $34,483 for "expense incurred prior to 1/1/46." It is not clear whether any part of the $34,483 was intended as an offset to the $4,539,607 figure for "depreciation."

the taxpayer conducts and \* \* \* applicable in the light of the taxpayer's business experience and accounting practice." Reg. 130, § 40.433(b)–3(d) (2).

88. Plaintiff has failed to prove by a fair preponderance of the credible evidence that its alleged "strike expense" as defined in Rooney's letter of February 22, 1946 (Findings of Fact #71, #75, #78) is a separate and distinct class of deductions within the meaning of § 433 (b) (9) and Reg. 130, § 40.433(b)–3(d) (2).

89. Plaintiff has failed to prove by a fair preponderance of the credible evidence that it is entitled to application of § 433(b) (9) for the year 1949.

### DISCUSSION OF PLAINTIFF'S § 433(b) (9) CLAIM

■ The issue presented by a taxpayer's proposed classification of deductions is largely one of fact. Quaker Oats Co., 28 T.C. 626, 642 (1957); Great American Indemnity Co., 19 T.C. 229, 235 (1952), aff'd per curiam, 211 F.2d 407 (2nd Cir. 1954); Denman Tire & Rubber Co., 14 T.C. 706, 721 (1950), aff'd on other grounds, 192 F.2d 261 (6th Cir. 1951); Tovrea Land & Cattle Co., 10 T.C. 90, 95 (1948); Green Bay Lumber Co., 3 T.C. 824, 831 (1944).

Plaintiff has already acknowledged that "all except a relatively small part" of the alleged "strike expense" reported for the periods of the 1946 and 1949 strikes on Exhibit 244 and Exhibit 122, p. 16 would have been incurred by U. S. Steel whether or not the strikes had occurred. (See Findings of Fact #77, #80)

In support of its claim, plaintiff argues that the objective and purpose of "paying or accruing any charges, including fixed costs" in connection with the 1946 and 1949 strikes should be distinguished for § 433(b) (9) purposes from the objective and purpose of paying or accruing expenses during other periods. Plaintiff suggests in very broad, conclusory terms that the "objective and purpose" of incurring *all* expenses during the 1946 and 1949 strike periods was "in relation to preserving plant and management apparatus while no products are being produced," while the "objective and purpose" of incurring expenses during other periods is simply "to turn out steel." (Plaintiff's Memorandum of Law Re Alternative Claim as to Strike Expenses, April 24, 1970, p. 9) While engaged in semantics, plaintiff does not seem to consider the fact that it must also incur expenses "in relation to preserving plant and management apparatus" during periods when it is "turning out steel." U. S. Steel has provided this court with no basis for assuming that the total amount of expense incurred "to turn out steel" does not embrace many items of expense related to preservation of plant and management apparatus.

In short, preservation of plant and management apparatus is an ongoing endeavor for a manufacturer. Such "preservation" is an expense factor at times when plaintiff's steel-making facilities are in operation as well as times when its steel-making facilities are shut down completely. This court cannot subscribe to a general theory that (a) all expenses incurred to maintain physical facilities and management structure during a period when production and shipments of steel products is stopped completely due to a strike may be distinguished in objective and purpose under § 433(b) (9) from (b) all such expenses incurred during other periods.

Plaintiff relies on holdings in several Tax Court cases, particularly Arrow-Hart & Hegeman Electric Co., 7 T.C. 1350 (1946) and National Biscuit Co., 29 T.C. 409 (1957). However, none of the holdings in cases cited by plaintiff applies to the record presented in the instant case. In Arrow-Hart, the court held, on the factual record presented, that a taxpayer's expenses for "salaries paid in excess of employment period" (i. e., pensions, payments to widows, sickness pay and severance allowance) belonged in a class of deductions separate and distinct from "routine salaries."

Arrow-Hart & Hegeman Electric Co., supra at 1372–1375.

In National Biscuit, the court cited the holding in Arrow-Hart and held that vacation pay should be treated as a separate class of deductions just as pensions were in Arrow-Hart. National Biscuit Co., supra, 29 T.C. at 416. The court reasoned that vacation pay was akin to pensions and that each of these types of compensation covered a period during which the employee was not required to perform services.

In the present case, the evidence indicates that U. S. Steel employees were paid wages or salaries during the period of the 1949 strike only if they were "ready and willing to work at management's direction" during the strike. (See Findings of Fact #81, #82) In contrast to the situations in Arrow-Hart and National Biscuit, payments of salaries and wages to U. S. Steel employees during the strike period were subject to the same basic requirements as payments during other periods. Employees received wages and salaries only upon the condition that they satisfied the directives of management and exhibited a readiness to work during the strike period.

Plaintiff also relies on United Steelworkers of America v. C.C.I. Corporation, 395 F.2d 529 (10th Cir. 1968), cert. denied, 393 U.S. 1019, 89 S.Ct. 627, 21 L.Ed.2d 564 (1969); and W. L. Mead, Inc. v. International Brotherhood of Teamsters, 129 F.Supp. 313 (D.Mass. 1955), aff'd, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 25, A.F.L. v. W. L. Mead, 230 F.2d 576 (1st Cir. 1956), appeal dismissed on other grounds, 352 U.S. 802, 77 S.Ct. 21, 1 L.Ed.2d 37 (1956). However, neither of these cases dealt with tax considerations. Instead, the actions involved employers' claims against unions for damages resulting from breaches of collective bargaining agreements.

Plaintiff included "accrued" ad valorem taxes and "accrued" depreciation as items of expense under its broad classification of "strike expense." Ad valorem property taxes are based upon ownership of property, and are payable regardless of whether the property is used or not. See Finding of Fact #83; Powell v. Gleason, 50 Ariz. 542, 74 P.2d 47, 50 (1937); see also Pacific Fruit Express Co. v. Oklahoma Tax Commission, 27 F.Supp. 279, 283 (W.D.Okla.1939); United States v. Allegheny County, 322 U.S. 174, 184, 64 S.Ct. 908, 88 L.Ed. 1209 (1944).

■ Depreciation in general is a measured allowance (for wear and tear and absolescence of a depreciable asset) allocated on a time basis for the period of the estimated useful life of the asset. See Fribourg Navigation Co., Inc. v. Commissioner of Internal Revenue, 383 U.S. 272, 276–277, 86 S.Ct. 862, 15 L.Ed. 2d 751 (1966); United States v. Ludey, 274 U.S. 295, 300–301, 47 S.Ct. 608, 71 L.Ed. 1054 (1927); Accountants' Handbook, section 17 (4th ed. 1965). Depreciation expense accrues during a period when production at steel-making facilities is stopped completely due to a strike as well as during other periods.

U. S. Steel, pointing to Rooney's letter of February 22, 1946, argues that "it was plaintiff's accounting practice to label all expenses incurred during the course of a general steel strike as 'strike expense.'" (Plaintiff's Memorandum of Law, April 24, 1970, p. 11; Findings of Fact #71, #75) However, plaintiff's witness Scott conceded that the primary purpose of labeling all such expenses as "strike expense" was to show U. S. Steel's total cash costs during the period of the strike. (Finding of Fact #79) Plaintiff failed to establish that many of the items of expense labeled as "strike expense" differed in character from comparable items of expense incurred during other periods. (Findings of Fact #81–#85, #86)

■ As far as plaintiff's accounting practice is concerned, I believe that the

testimony of its witnesses on the § 433 (b) (9) claim was inconclusive. At any rate, a taxpayer's accounting practice is but one factor to be considered by a court in weighing a claim for separate classification of deductions under § 433(b) (9) and its forerunner in the World War II Act, 26 U.S.C. Excess Profits Taxes § 711(b) (1) (J). See Quaker Oats Co., supra, 28 T.C. at 644; Frank H. Fleer Corporation, 10 T.C. 191, 199 (1948). If accounting practice were necessarily determinative, eligibility for relief might be based upon the complex nature of a taxpayer's accounting system rather than upon reasonableness in classification of deductions. See, generally, Great American Indemnity Co., supra, 19 T.C. at 237–238.

In several decisions, the Tax Court has commented generally that § 711(b) (1) (J) and its Korean Act counterpart, § 433(b) (9), were intended as "remedial" statutes. However, in each case where this general comment has been made, the Tax Court has proceeded to examine the evidence presented in order to make a factual determination. In some instances, the court found that a taxpayer's proposed classification was justified. (See, e. g., Green Bay Lumber Co., supra; National Biscuit Co., supra) In another, the court decided that the taxpayer was not entitled to relief under the relevant statute. (See Quaker Oats Co., supra, 28 T.C. at 644 ("The objective and purpose for all four types of expenditures was substantially the same, and we know of no reason why they should be grouped into more than one 'class' for the purpose of the statute." ))

On the record presented herein, this court concludes that U. S. Steel has failed to establish its alleged "strike expense" as a separate and distinct class of deductions within the meaning of § 433(b) (9) and its concomitant regulation. (See Findings of Fact #68–#89)

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this action pursuant to 28 U.S.C. § 1346(a) (1).

2. As to plaintiff's claim for additional depletion deductions pursuant to 26 U.S.C. §§ 23(m) and 114(b) (4) (1939 Code), there is no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law. 270 F.Supp. 253 (S.D.N.Y.1967).

3. As to plaintiff's claim that "low quality of coking coal and iron ore, resulting in loss of production" was a qualifying abnormality for excess profits tax purposes within the meaning of 26 U.S.C. Excess Profits Taxes § 442 (1939 Code), there is no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law. 305 F. Supp. 497 (S.D.N.Y.1969), 305 F.Supp. 516 (S.D.N.Y.1969).

4. As to plaintiff's claim that "abnormal cost-price relationships, resulting in the depression of Plaintiff's business and earnings" constituted a qualifying abnormality within the meaning of § 442, there is no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law. 305 F. Supp. 508 (S.D.N.Y.1969), 305 F.Supp. 516 (S.D.N.Y.1969).

With respect to the issues tried by the court January 19–23, January 26–30, February 2–3, February 19–20, February 24–27, March 2–5, and May 22, 1970, this court makes the following conclusions of law:

5. Plaintiff has failed to prove by a fair preponderance of the credible evidence that two 1948 strikes were "unusual" events within the meaning of § 442(a) (1).

6. Plaintiff has failed to prove by a fair preponderance of the credible evidence that its normal production, output or operation was interrupted or diminished to a legally significant extent in 1948 as a result of the South Works explosion, the only "unusual" occurrence within the meaning of § 442 which U. S. Steel established for 1948.

7. Plaintiff has failed to prove by a fair preponderance of the credible evidence that it is entitled to application of § 442 for the year 1948.

8. Plaintiff has proved by a fair preponderance of the credible evidence that its normal production, output or operation was interrupted or diminished to a legally significant extent in 1949 as a result of the 1949 strike by the United Steel Workers, an "unusual" occurrence within the meaning of § 442.

9. Plaintiff has proved by a fair preponderance of the credible evidence that it is entitled to application of § 442 (c) for the year 1949.

10. Plaintiff has failed to prove by a fair preponderance of the credible evidence that its alleged "strike expense" is a separate and distinct class of deductions within the meaning of 26 U.S.C. Excess Profits Taxes § 433(b) (9) (1939 Code).

11. Plaintiff has failed to prove by a fair preponderance of the credible evidence that it is entitled to application of § 433(b) (9) for the year 1949.

To summarize briefly, plaintiff is entitled to application of § 442(c) for the year 1949; in all other respects, the complaint must be dismissed.

Settle judgment on notice in accordance with the above determinations. No costs.